## STATE OF CONNECTICUT v.
## FRED JOHN ANDERSON
## (AC 21322)

Dranginis, Flynn and West, Js.

---

Argued October 29, 2002—officially released January 28, 2003

*Kent Drager,* senior assistant public defender, with whom were *Raymond Durelli,* certified legal intern, and, on the brief, *Mary Boehlert,* certified legal intern, for the appellant (defendant).

*Paul E. Murray,* state's attorney, with whom, on the brief, was *Kevin T. Kane,* state's attorney, for the appellee (state).

*Opinion*

WEST, J. The defendant, Fred John Anderson, appeals from the judgment of conviction, rendered after a trial to the jury, of unlawful restraint in the first degree in violation of General Statutes § 53a-95, assault in the first degree with intent to disfigure another person seriously and permanently in violation of General Statutes § 53a-59 (a) (2), and interfering with an officer in violation of General Statutes § 53a-167a. The defendant claims that the court improperly (1) denied his motion for a judgment of acquittal because there was insufficient evidence to prove beyond a reasonable doubt that (a) he had the requisite intent to disfigure the victim seriously and permanently, and (b) the victim in fact was seriously and permanently disfigured, and (2) admitted into evidence (a) the victim's statement pursuant to the *Whelan* doctrine[1] and (b) the victim's hospital records. We affirm the judgment of the trial court.

The charges against the defendant arose out of a physical altercation between the defendant and the victim, who had a romantic relationship. The altercation occurred during the early morning hours of January 9, 1999. The defendant, an admitted alcoholic, had been drinking and became physically abusive toward the victim. Officer James Kiako of the Groton police department responded to a 911 telephone call from the defendant's apartment. When he arrived, Kiako could see through a window a disheveled woman with blood around her mouth and nose. Kiako and another officer gained entry into the apartment after the defendant unlocked the interior deadbolt lock. After talking to the victim and the defendant separately, the officers arrested the defendant. The victim was hospitalized for several days for treatment of her injuries. Additional

---

[1] *State* v. *Whelan,* 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

facts will be provided when they are needed to address the defendant's specific claims.

I

The defendant first claims that the court improperly denied his motion for a judgment of acquittal with respect to the charge of assault in the first degree.[2] At trial, the defendant claimed that there was insufficient evidence from which the jury reasonably could find that the victim had suffered serious and permanent disfigurement. On appeal, the defendant also claims that there was insufficient evidence from which the jury reasonably could find that he intended to cause the victim serious and permanent disfigurement. We will review the defendant's claim as to intent, although it was not raised at trial, because claims of insufficient evidence are of a constitutional nature and the record is adequate for our review. See *State* v. *Adams*, 225 Conn. 270, 275–76 n.3, 623 A.2d 42 (1993); *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989); *State* v. *Jefferson*, 67 Conn. App. 249, 254–55, 786 A.2d 1189 (2001), cert. denied, 259 Conn. 918, 791 A.2d 566 (2002). The defendant, however, cannot prevail on either claim of insufficient evidence.

"In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

---

[2] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when . . . (2) with intent to disfigure another person seriously and permanently, or to destroy, amputate or disable permanently a member or organ of his body, he causes such injury to such person or to a third person . . . ."

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Citation omitted; internal quotation marks omitted.) *State* v. *Meehan*, 260 Conn. 372, 377–78, 796 A.2d 1191 (2002).

"Our review is a fact based inquiry limited to determining whether the inferences drawn by the jury are so unreasonable as to be unjustifiable." (Internal quotation marks omitted.) *State* v. *Ford*, 230 Conn. 686, 692, 646 A.2d 147 (1994). "Moreover, [i]n reviewing the jury verdict, it is well to remember that [j]urors are not expected to lay aside matters of common knowledge or their own observation and experience of the affairs of life, but, on the contrary, to apply them to the evidence or facts in hand, to the end that their action may be intelligent and their conclusions correct." (Internal quotation marks omitted.) Id., 693.

A

The defendant's first claim of insufficient evidence is that the state failed to prove beyond a reasonable doubt that he intended to disfigure the victim seriously and permanently. Specifically, the defendant claims that the state failed to prove that he had the conscious objective, as defined by General Statutes § 53a-3 (11),[3]

_____

[3] General Statutes § 53a-3 (11) provides in relevant part: "A person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result . . . ."

to cause the victim's face to be scarred because her scars are a long-term, secondary result of his action.[4] In other words, a scar results only after a wound has healed completely. We disagree.

"To be guilty of assault in the first degree, of which the defendant was convicted, the defendant must *intend* to disfigure another person seriously and permanently. General Statutes § 53a-59 (a) (2). To act intentionally, the defendant must have had the conscious objective to harm the victim. General Statutes § 53a-3 (11)." (Emphasis in original.) *State* v. *Smith*, 35 Conn. App. 51, 63, 644 A.2d 923 (1994); see also *State* v. *Austin*, 244 Conn. 226, 235, 710 A.2d 732 (1998) (" 'defendant must have had the conscious objective' ").

"Intent may be, and usually is, inferred from the defendant's verbal or physical conduct. . . . Intent may also be inferred from the surrounding circumstances. . . . The use of inferences based on circumstantial evidence is necessary because direct evidence of the accused's state of mind is rarely available. . . . Intent may be gleaned from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading up to and immediately following the incident. . . . Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant *intended the natural consequences of his voluntary conduct*." (Citations omitted; emphasis added; internal quotation

---

[4] The defendant argued that the state overcharged him by alleging assault in the first degree pursuant to General Statutes § 53a-59 (a) (2). In his appellate brief, the defendant concedes that the state probably could have convicted him of assault in the second degree in violation of General Statutes § 53a-60 (a) (1) (intent to cause serious physical injury to another person) because the victim sustained a broken nose and rib. "Assault in the third degree in violation of [General Statutes] § 53a-61 (a) (2) could be a lesser included offense of assault in the first degree in violation of § 53a-59 (a) (2)." *State* v. *Smith*, 35 Conn. App. 51, 59, 644 A.2d 923 (1994).

marks omitted.) *State* v. *Smith,* supra, 35 Conn. App. 63–64.

The victim's testimony conflicted with other evidence presented about the events that occurred during the early morning hours of January 9, 1999, including some of the defendant's testimony. Credibility, however, is a matter solely within the province of the trier of fact. See *State* v. *Jimenez,* 73 Conn. App. 664, 668, 808 A.2d 1190, cert. denied, 262 Conn. 929, 814 A.2d 381 (2002). The victim's statement, given several days after the incident, contained her initial account of what occurred during the night of January 8 and the early morning of January 9, 1999. The victim's redacted statement was admitted into evidence; see part II A; and presented to the jury. The following portions of the victim's statement are relevant to the issue of the defendant's intent:

"The drinking problem was getting very bad, and [the defendant] got drunk almost every time we were together. I had told [the defendant] that I was tired of his drinking and I wanted him to stop. I told him if he didn't stop, I was going to leave him.

"On the evening of January 8, 1999, [the defendant] and I were together. . . . I drove him back to his apartment at [approximately] 2:30 a.m. I went inside the apartment to get my belongings. I told him inside the car, prior to entering the apartment, I was tired of his drinking and I had enough. I told him I didn't care any more, and I wanted to get my things from the apartment and I wanted to go home. Once we got inside the apartment, I gathered my things and I went to leave. [The defendant] locked the only exit from the inside, and he put the key in his mouth. I told him I wanted to leave, but he would not open the door. I continued to tell [the defendant] I had enough and I wanted out of the relationship. I think now he had a difficult time with my rejection.

"[The defendant] was standing in the kitchen against the washing machine. I walked over near him to go toward the door. When I was about two feet away, he grabbed me and butted me in the head and face with his forehead. He said nothing when he did this. I immediately felt extreme pain, started bleeding and could feel that my nose was pushed to the side of my face. I started crying and yelling at him to look [at] what he had done. I knew my nose was broken, and I just wanted to get out of the apartment to get help. [The defendant] started taunting me, telling me I was fine and there was nothing wrong with me. He was saying Connecticut people are so weak. He told me to stay at the apartment and in the morning he would let me go. He said in the morning everything would be fine, and I should stop crying and making such a fuss over nothing.

"I continued asking [the defendant] to let me go. He refused. He became more angry and grabbed me again. He threw me to the floor and started banging my head against the floor. I was yelling and crying for him to stop. [The defendant] began to bite me on the face. He tried to bite me on the left side of the face near my ear, but he couldn't get any skin. He then bit me on the cheek and the bottom lip. He bit me so hard I started bleeding from these cuts as well. I started telling him everything was OK and I still cared for him. This is when he let me up. I went to the bathroom and looked in the mirror at my face. I couldn't believe what he had done to my face. I was bleeding all over. While I was looking in the mirror crying, he came into the bathroom and grabbed the mirror. He pulled the mirror off the front of the medicine cabinet, and the glass shattered out of the frame.

"I was standing in the bathroom among the glass when [the defendant] grabbed a hair dryer which was hanging on a hook. He grabbed the dryer and smashed the dryer on the left side of my head. I grabbed my

head and ran from the bathroom. I ran into the kitchen and sat down at the table, holding my head and face. I ran from the bathroom not only to get away from him, but because I thought he was going to use the cord from the hair dryer to strangle me. [The defendant] followed me into the kitchen. He grabbed me from the chair and threw me to the floor again. He punched me in the left side of my chest while I was on the floor. I felt so much pain I couldn't do anything but lay on the floor. While on the floor, he also kicked me in the chest. I was feeling so much pain, I didn't want to live any more. [The defendant] got on top of me and grabbed my throat with both his hands. He started choking me with his hands. I couldn't breathe, and I started to black out. I grabbed his hair with both my hands and began pulling his hair. He stopped choking me and started complaining because I grabbed his hair. I was still laying on the ground when he took his fingers and grabbed the sides of my eyes. [He] started pulling the skin of my eyes and was saying, 'you look Chinese.' "

In addition to the victim's statement, the jury viewed eight photographs of the victim's head and face that were taken while she was in the hospital recovering from the injuries she sustained during the incident. The jury also looked at photographs of the interior of the defendant's apartment that were taken immediately after the incident. In addition, the victim's hospital record was admitted into evidence. Furthermore, the victim was present in the courtroom where the jury could observe the scars on her face.

On the basis of our review of the evidence presented at trial, we conclude that there was sufficient evidence from which the jury reasonably could have concluded that the defendant, in fact, bit the victim about the face, butted her face with his head, struck her in the head with a hair dryer, kicked her and attempted to choke her. The jury reasonably could have inferred from that

evidence that the defendant had the conscious objective to cause the victim serious and permanent disfigurement and to cause that result.

B

The defendant also claims that there was insufficient evidence before the jury for it to conclude beyond a reasonable doubt that the victim suffered serious and permanent disfigurement. We do not agree.

At trial, the state called the victim to testify. The state also entered into evidence photographs of the victim taken in her hospital bed in which she is depicted as having sutured lacerations about her mouth and nose and in her scalp. Although the victim, who was a reluctant witness; see part II A; made light of the scars on her face, she was asked to stand in front of the jury so the jury could observe her face. In addition, the victim's hospital records were admitted into evidence. Daniel Hartman, a physician board certified in emergency medicine who had treated the victim, testified. According to Hartman, every laceration will leave a scar to some extent. A physician's main concern with facial lacerations is scarring because that is obviously visible. Hartman described the type of sutures used to treat the victim's face. The straighter the edges of the laceration are, the less scarring will occur. Human bites leave irregular edges that are more difficult to approximate than lacerations with straight edges. Human bites are of particular concern because they present a high risk of infection.

The defendant's argument on appeal is that there was no specific evidence that the lacerations on the victim's face left serious scars because one of the lacerations was only one centimeter in length and the other one was slightly longer than one and one-half centimeters in length. He argues that the lacerations were treated quickly with a special form of suturing and that there

was no evidence that the treatment was not effective. The victim suffered no infections at the sites of the lacerations and was not referred to a plastic surgeon for additional care. The defendant also relies on the victim's testimony that the scarring was barely visible. Despite his acknowledging that Hartman testified that all lacerations leave scars, the defendant also argues that the state presented no evidence that the victim's scars were permanent and that the jury is not permitted to speculate about such matters.

As we have stated, the victim was reluctant to testify against the defendant. Her lack of concern about the scars on her face is not controlling. "The victim's attitude about the scar and the need for corrective surgery are completely irrelevant to the question of permanency." *State* v. *Smith*, supra, 35 Conn. App. 62. The trial occurred more than eighteen months after the incident, and the jury was able to observe the scars on the victim's face. "A trier of facts can conclude, by inference, that an injury will be permanent even though there is no medical testimony expressly substantiating permanency. See note, 18 A.L.R.3d 170, 183–84." *Royston* v. *Factor*, 1 Conn. App. 576, 577, 474 A.2d 108, cert. denied, 194 Conn. 801, 477 A.2d 1021 (1984).

In support of his claim, the defendant has cited a number of cases from other jurisdictions holding that a small scar on the victim's head or face is not a serious disfigurement. Here, the victim was asked to stand directly in front of the jury so that the jury could observe the scars on her face and make its own determination as to whether her face was seriously disfigured. General Statutes § 53a-3 (4) provides in relevant part: " 'Serious physical injury' means physical injury which creates a substantial risk of death, or *which causes serious disfigurement* . . . ." (Emphasis added.) Whether there is serious physical injury that causes serious dis-

figurement is a question of fact for the jury. See *State v. Almeda*, 211 Conn. 441, 450, 560 A.2d 389 (1989).

This court addressed the question of whether the state had proved that a victim suffered serious physical injury when she sustained a one-half inch scar on her lip in *State v. Nival*, 42 Conn. App. 307, 678 A.2d 1008 (1996). In *Nival*, the state relied on the serious disfigurement element of the definition provided in § 53a-3 (4). Id., 309 n.4. "No bright line exists between physical injury and serious physical injury, and the trial court could not have determined as a matter of law that the jury could not reasonably find that [the victim] suffered serious physical injury." Id., 309, citing *State v. Almeda*, supra, 211 Conn. 451.

Here, there was evidence before the jury concerning the defendant's assault on the victim, the victim's wounds and the treatment she received. The victim's treating physician testified as to the nature of lacerations, human bites and scarring. The jury had an opportunity to observe the scars on the victim's face. Accordingly, the court properly determined that the jury reasonably could have found that the evidence of the scars on the victim's face constituted serious, permanent disfigurement. See *State v. Nival*, supra, 42 Conn. App. 309. We therefore conclude that the court properly denied the defendant's motion for a judgment of acquittal.

## II

We now address the defendant's evidentiary claims. The defendant claims that the court improperly admitted into evidence (1) the victim's written statement and (2) the victim's hospital record. We find no merit to the defendant's claims.

We have a well established standard by which we review claims of an evidentiary nature. "The trial court's

ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did." (Internal quotation marks omitted.) *State* v. *Vega*, 259 Conn. 374, 392, 788 A.2d 1221, cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002); *State* v. *Colon*, 71 Conn. App. 217, 233, 800 A.2d 1268, cert. denied, 261 Conn. 934, 806 A.2d 1067 (2002). "It is a fundamental rule of appellate procedure in the review of evidential rulings, whether resulting in the admission or exclusion of evidence, that an appellant has the burden of establishing that there has been an erroneous ruling which was probably harmful to him." (Internal quotation marks omitted.) *State* v. *Tinsley*, 59 Conn. App. 4, 10, 755 A.2d 368, cert. denied, 254 Conn. 938, 761 A.2d 765 (2000).

A

The defendant first claims that the court improperly admitted the victim's written statement to the police as substantive evidence pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), because the statement was not reliable. The defendant contends that admitting the statement into evidence was harmful to him because it contained the only evidence to support the charges of unlawful restraint and assault in the first degree. We disagree.

"The admissibility of evidence, including the admissibility of a prior inconsistent statement pursuant to *Whelan*, is a matter within the wide discretion of the trial court. See *State* v. *Alvarez*, 216 Conn. 301, 314, 579

A.2d 515 (1990) (trial court did not abuse discretion in admitting witness' prior statement to police for substantive purposes). On appeal, the exercise of that discretion will not be disturbed except on a showing that is has been abused. Id." *State* v. *Newsome*, 238 Conn. 588, 596, 682 A.2d 972 (1996).[5]

The following facts are relevant to our resolution of the defendant's claim. On the morning of January 11, 1999, Thomas J. Smith, a detective on the Groton police force, visited the victim in her hospital room.[6] Smith talked with the victim for about one hour and took notes. He, however, did not take a statement from the victim at that time out of concern for her welfare. After the victim was discharged from the hospital, Smith visited with her in her home on January 13, 1999. At that time, Smith spent two to three hours with the victim, discussing the incident and drafting her statement about the incident on a laptop computer. When he met with her, Smith found the victim to be quite lucid. He had no trouble communicating with her, except when he could not understand her heavy accent. In those instances, Smith asked the victim to repeat herself. What the victim told Smith on January 13 was consistent with what she had told him on January 11.

Smith drafted the victim's statement paragraph by paragraph. After he had completed a paragraph, Smith read the paragraph to the victim and asked her if

[5] The defendant argues on appeal that his claim is one of constitutional nature rather than an evidentiary one. Where the court improperly has admitted a statement under *Whelan*, a defendant is denied the opportunity to impeach a witness for motive, bias and interest, which implicates the protection of the confrontation clause. See *State* v. *Portee*, 55 Conn. App. 544, 560 n.12, 740 A.2d 868 (1999), cert. denied, 252 Conn. 920, 744 A.2d 439 (2000). Because we conclude that the court did not abuse its discretion in admitting the victim's statement for substantive purposes, the defendant's constitutional right to confrontation was not implicated.

[6] Smith had been a member of the Groton police department for fourteen years, nine as a detective.

changes were needed. When the four page statement had been completed, Smith read the entire statement to the victim to ensure its accuracy. It was approximately 6 p.m. when Smith and the victim finished writing her statement. Due to the late hour, Smith told the victim that he would go to the police station to print the statement and return the next day for her to sign the statement.

Smith returned to the victim's home the next day.[7] He gave the statement to the victim to review. Smith also read the statement to the victim. The victim expressed no disagreement with the content of the statement and signed the statement.

At trial, the victim was a reluctant witness.[8] She was born in Spain and was educated in Spain, France and Italy. She came to the United States in 1979. Although the victim is a citizen of the United States and holds a Connecticut operator's license, she testified that she cannot read English. When the court reporter asked her to spell her name, the victim could not state the letters of her name in English. The victim testified that she learned to speak English by watching television and that she prepared for the tests for citizenship and for her operator's license by memorizing the material as one would memorize the words to a song. She claimed that both examinations were given orally. She also testified that she had a degree in psychology from Old Dominion University, where she studied under just one professor, who instructed her in Italian.

The victim had known the defendant for approximately five months before the incident. At trial, she denied that the defendant caused her injuries and claimed that they were the result of her butting the

---

[7] The victim's adult daughter was present during both of Smith's visits.

[8] The defendant's first trial ended in a mistrial after the victim approached a member of the jury to ask for mercy for the defendant.

defendant and cutting her lip on a beer bottle. She also testified that she wanted to leave the defendant's apartment when she was bleeding, but that the defendant restrained her to prevent her from operating an automobile when she was in no condition to do so. When the state presented her with her written statement, the victim said that she did not recognize it, although she acknowledged her signature on the statement. The victim testified that she did not read the statement when Smith gave it to her and that she thought she was signing a document to have the charges against the defendant dropped.

Thereafter, the state sought to introduce the victim's statement for substantive purposes pursuant to *State* v. *Whelan*, supra, 200 Conn. 753. The defendant objected, arguing that the statement should not be admitted because it was unreliable due to the effects of the pain medication that the victim was taking at the time she gave and signed the statement and because she could not read English. The court conducted a hearing concerning the taking of the victim's statement and, thereafter, admitted the prior inconsistent statement for substantive purposes. Portions of the statement concerning the defendant's prior misconduct were redacted. The redacted statement was published to the jury.

On appeal, the defendant acknowledges that the victim's written statement meets the four-pronged test of *Whelan*, but argues that the statement was signed under circumstances that make it unreliable. The defendant acknowledges that under *Whelan*, a prior inconsistent statement may be used for substantive purposes if it is signed by the witness, as the signature serves to authenticate the statement. He argues that in this instance, however, because the victim could not read the statement prepared by Smith, she did not realize what she was signing, and therefore her signature on

the statement failed to authenticate it. The defendant also argues that Smith's testimony regarding the circumstances under which he took the victim's statement and under which she signed the statement cannot be used to authenticate her signature.

In *Whelan*, our Supreme Court adopted "a rule allowing the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination." Id. Our Supreme Court reasoned that "[t]he jury can . . . determine whether to believe the present testimony, the prior statement, or neither. Moreover, prior statements are, necessarily, made closer to the event in question, when memories are fresher and when there is less likelihood that the statement is the product of corruption, false suggestion, intimidation or appeals to sympathy." Id., 750.

Subsequently, our Supreme Court has recognized that the circumstances under which a prior inconsistent statement was made may taint the statement's reliability. See *State* v. *Mukhtaar*, 253 Conn. 280, 750 A.2d 1059 (2000). "[A] prior inconsistent statement that fulfills the *Whelan* requirements may have been made under circumstances so unduly coercive or extreme as to grievously undermine the reliability generally inherent in such a statement, so as to render it, in effect, not that of the witness. In such circumstances, the trial court must act as a gatekeeper to ensure that the statement does not go to the jury for substantive purposes. We emphasize, however, that the linchpin of admissibility is reliability: the statement may be excluded as substantive evidence only if the trial court is persuaded, in light of the circumstances under which the statement was made, that the statement is so untrustworthy that its admission into evidence would subvert the fairness of the fact-finding process. In the absence of such a

showing by the party seeking to exclude a statement that meets the *Whelan* criteria, the statement is admissible as substantive evidence; like all other evidence, its credibility is grist for the cross-examination mill." Id., 306–307.

Here, the court followed the procedure our Supreme Court established to fulfill the court's gatekeeping responsibility under *Mukhtaar* to ensure the reliability of the victim's written statement. "If a statement meets the four *Whelan* requirements, it will be deemed admissible, unless the party seeking to exclude it makes a preliminary showing of facts that, if proven true, would grievously undermine the statement's reliability. If such a showing has been made—and we leave the methods and contours of such a showing to the discretion of the trial court—the court should then hold a hearing to determine the truth of those facts and whether they do, in fact, grievously undermine the reliability of the statement. The ultimate question for the trial court, therefore, is whether, notwithstanding the statement's satisfaction of the *Whelan* requirements, the circumstances under which the statement was made nonetheless render it so unreliable that a jury should not be permitted to consider it for substantive purposes." Id., 307 n.27. "[T]he trial court's factual findings on this issue will not be disturbed on appeal unless they are clearly erroneous." Id., 307 n.26.

Smith testified and was cross-examined outside the presence of the jury about the manner in which he took the victim's statement. In ruling that the victim's statement would be admitted for substantive purposes, the court read extensively from *Mukhtaar* and made factual findings. The court found that the victim did not want to be in court to testify against the defendant and that her claimed inability to read English was questionable. The court also found that the defendant presented no evidence to indicate, in light of the totality

of the circumstances in which the victim made and signed the statement, that it was untrustworthy and that its admission into evidence would subvert the fairness of the fact-finding process.

On the basis of our review of the transcript of the victim's testimony, the statement and Smith's testimony at the *Mukhtaar* hearing, we conclude that the court's findings of fact are not clearly erroneous and that it did not abuse its discretion in admitting the victim's inconsistent statement into evidence. The defendant had the opportunity to cross-examine the victim. Her credibility and that of all witnesses was a matter for the jury to decide. Furthermore, the defendant testified at trial, and portions of his testimony lend credibility to the victim's statement.

B

The defendant's second evidentiary claim is that the court improperly admitted into evidence the victim's hospital records and Hartman's testimony regarding the records without the victim's consent to reveal the contents of the records. The defendant has asserted that claim pursuant to General Statutes § 52-146o.[9] We are not persuaded.

After the victim testified, the state offered her hospital records to be placed into evidence. The defendant objected, asserting that the victim had not waived her right to keep the records confidential pursuant to § 52-

---

[9] General Statutes § 52-146o (a) provides: "Except as provided in sections 52-146c to 52-146j, inclusive, and subsection (b) of this section, *in any civil action* or any proceeding preliminary thereto or in any probate, legislative or administrative proceeding, a physician or surgeon, as defined in subsection (b) of section 20-7b, shall not disclose (1) any communication made to him by, or any information obtained by him from, a patient or the conservator or guardian of a patient with respect to any actual or supposed physical or mental disease or disorder or (2) any information obtained by personal examination of a patient, unless the patient or his authorized representative explicitly consents to such disclosure." (Emphasis added.)

146o. The state responded that the defendant did not have standing to assert the victim's right to keep the records confidential and that the language of the statute limits its application to civil proceedings. The court overruled the defendant's objection, noting, among other things, that § 52-146o applies to civil, not criminal proceedings. A redacted version of the victim's hospital records was admitted into evidence.[10]

Although the defendant's claim is of an evidentiary nature, he correctly points out that the claim is to be resolved by statutory construction. Statutory construction is a question of law to which a plenary standard of review applies. See *State* v. *Vickers*, 260 Conn. 219, 223, 796 A.2d 502 (2002); *State* v. *Hackett*, 72 Conn. App. 127, 132, 804 A.2d 225, cert. denied, 262 Conn. 904, 810 A.2d 270 (2002). "According to our long-standing principles of statutory [interpretation], our fundamental objective is to ascertain and give effect to the intent of the legislature. . . . In determining the intent of a statute, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *State* v. *Hackett*, supra, 132.

"As with any issue of statutory interpretation, our initial guide is the language of the operative statutory provisions." (Internal quotation marks omitted.) *Fimiani* v. *Star Gallo Distributors, Inc.*, 248 Conn. 635, 642, 729 A.2d 212 (1999). "A cardinal rule of statutory construction is that where the words of a statute [or rule] are plain and unambiguous the intent of the [draft-

---

[10] Because we resolve the defendant's claim pursuant to our construction of the statute, we need not determine whether the defendant had standing to assert the victim's right to keep the records confidential.

ers] in enacting the statute [or rule] is to be derived from the words used. . . . Where the court is provided with a clearly written rule, it need look no further for interpretive guidance." (Internal quotation marks omitted.) *Schiappa* v. *Ferrero*, 61 Conn. App. 876, 882, 767 A.2d 785 (2001). "It is our duty to interpret statutes as they are written. . . . Courts cannot, by construction, read into statutes provisions which are not clearly stated. . . . The legislature is quite aware of how to use language when it wants to express its intent to qualify or limit the operation of a statute." (Citations omitted; internal quotation marks omitted.) *State* v. *Ingram*, 43 Conn. App. 801, 825, 687 A.2d 1279 (1996), cert. denied, 240 Conn. 908, 689 A.2d 472 (1997).

"A common law privilege for communications made by a patient to a physician has never been recognized in this state." *Edelstein* v. *Dept. of Public Health & Addiction Services*, 240 Conn. 658, 662, 692 A.2d 803 (1997). "In determining whether or not a statute abrogates or modifies a common law rule the construction must be strict, and the operation of a statute in derogation of the common law is to be limited to matters clearly brought within its scope. The court is to go no faster and no further than the legislature has gone. . . . A legislative intention not expressed in some appropriate manner has no legal existence." (Internal quotation marks omitted.) *Edmundson* v. *Rivera*, 169 Conn. 630, 633, 363 A.2d 1031 (1975).

Section 52-146o prohibits, except in specific circumstances, a physician, surgeon or health care provider from disclosing information about a patient or information communicated by a patient without the patient's consent. The language of the statute is clear and unambiguous as to the proceedings to which it applies, specifically, "in any civil action or any proceeding preliminary thereto or in any probate, legislative or administrative proceeding . . . ." General Statutes § 52-146o (a). We

need look no further than the words of the statute for the type of action to which it applies. It applies to civil actions, not to criminal actions. There is no question that the present matter is a criminal action. The defendant may not rely on § 52-146o to exclude the victim's hospital records and Hartman's testimony from evidence. The court, therefore, properly admitted the victim's hospital records and Hartman's testimony into evidence.

The judgment is affirmed.

In this opinion the other judges concurred.