STATE OF CONNECTICUT *v.* DANIEL J. CAMACHO
(AC 25014)

Dranginis, Gruendel and Hennessy, Js.

Argued September 16—officially released November 15, 2005

*James B. Streeto*, assistant public defender, for the appellant (defendant).

*Marjorie Allen Dauster*, senior assistant state's attorney, with whom, on the brief, were *Walter D. Flanagan*, state's attorney, and *David R. Shannon*, senior assistant state's attorney, for the appellee (state).

DRANGINIS, J. The defendant, Daniel J. Camacho, appeals from the judgment of conviction, rendered after a jury trial, of attempt to commit murder in violation of General Statutes §§ 53a-49 and 53a-54a, attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 and 53a-59, and assault in the first degree in violation of General Statutes § 53a-59. The jury also found that the defendant had used a firearm in the commission of those crimes in violation of General Statutes § 53-202k, and the court enhanced his sentence accordingly. On appeal, the defendant claims (1) that the state violated the constitutional prohibition against presenting evidence of postarrest silence subsequent to the administration by the police of the warning pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); see *Doyle* v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d (1976); (2) that the court improperly admitted (a) the statement of a witness and (b) an unsigned written document, and (3) that the prosecutor committed prejudicial misconduct. We disagree and affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On March 19, 2003, the defendant was the front seat passenger in a maroon Nissan Xterra being driven by Lydia P. Taylor. Antwaun Curry, who was sixteen years old, was a passenger in the backseat. Curry lived with his cousin, Chantay Gibson, who is the defendant's girlfriend. At approximately 6 p.m., the three arrived at the Harambee Center (center), a supervised recreational facility for young people in Danbury. Taylor parked the vehicle in an alley between the center and the First Congregational Church.

Curry entered the center and spoke to Michael Whitaker, who was playing basketball. Curry asked Whitaker to leave the center with him and go to a designated

location where the defendant "would shoot him the fair one."[1] The defendant harbored ill will against Whitaker, which arose out of a fight that Whitaker's brother had had with the defendant on New Year's Eve, 1999. Whitaker ignored Curry. Curry twice left the center and returned to ask that Whitaker go with him.

Whitaker telephoned two of his friends, Sylvanus Thompson and Matt Ramirez, asking them to meet him at the center so they could go to a bar together. Thompson and Ramirez arrived at the center between 7 and 7:15 p.m. Whitaker, Thompson and Ramirez left the center via the back door and saw the defendant sitting in the front passenger seat of the Xterra. Whitaker and Thompson were familiar with the defendant, whom they knew as "Danny." Curry and Thompson exchanged words, and then Thompson, Whitaker and Ramirez turned and walked away.

Gunshots were fired. Curry and Taylor later told the police that the defendant had pulled out a gun and started shooting. Thompson was injured by the shooting.[2] After he heard the first three gunshots, Whitaker turned and saw that Thompson had fallen. Whitaker then ran toward the center as the defendant fired two more gunshots. One of the bullets went over Whitaker's head and hit a brick wall, after penetrating a downspout. Neither Whitaker nor Thompson saw a gun, but they saw flashes of light coming from the front passenger side of the Xterra, where they had seen the defendant sitting. When the police arrived at the scene, Thompson told them that the defendant had shot him.

---

[1] "Shoot the fair one" is apparently street language for a fair fight with no weapons.

[2] Two bullets struck Thompson. One bullet entered his lower chest, traversed his liver and lodged in his lumbar spine. The bullet has not been removed for medical reasons. The second bullet fractured his right tibia. The second bullet was removed and later was determined to be a jacketed nine millimeter hollow point.

The police collected five nine millimeter shell casings from the southern end of the alley. Forensic examiners determined that the casings had been ejected from a semiautomatic weapon and that four of the five casings had been fired from the same gun. They were unable to determine the weapon from which the fifth casing had been shot. The police also recovered a nine millimeter jacketed bullet at the northern end of the alley. Forensic examiners were unable to determine whether the casings and bullet had been fired from the same gun.

After he had been arrested, the defendant told the police that he was sorry that Thompson had been hurt and that "he fired the gun, but he didn't want [Thompson] to get hit." At trial, however, the defendant denied being at the center and presented an alibi defense. Gibson and Joshua Beers testified that the defendant and Gibson had met Beers at a liquor store at about 7:30 p.m. and that the three of them had gone to a movie theater. Because the three could not agree on which movie to see, they went home.

Following his arrest, the defendant was charged in a long form information with attempt to commit murder, attempt to commit assault, assault in the first degree and, in a part B information, with commission of a class A, B or C felony with a firearm. The jury found the defendant guilty of the charges and stated in interrogatories that he had used a firearm in the commission of those offenses. The court sentenced him to an effective term of twenty-three years in the custody of the commissioner of correction. The defendant appealed.

I

The defendant's first claim is that the state violated the tenets of *Doyle* v. *Ohio*, supra, 426 U.S. 610, by presenting evidence of his postarrest silence after he was advised of his rights pursuant to *Miranda* v. *Ari-*

*zona,* supra, 384 U.S. 436, and compounded the error by referring to the evidence during its closing argument. We disagree with the defendant's claim.

The following facts are relevant to our resolution of this claim. Daniel Trompetta, a detective, arrested the defendant at an apartment in Waterbury on March 24, 2003. Trompetta, a witness for the state, testified in part on direct examination as follows:

"[The Prosecutor]: What did [the defendant] say to you when you placed him under arrest?

"[The Witness]: His first reaction was [that] he was astounded that we found him. He wanted to know how we found where he was. He said, 'No one knows where I am. How did you find me?' That was his major question.

"[The Prosecutor]: After you placed him under arrest, did you put him in a police car?

"[The Witness]: Yes. An unmarked police car.

"[The Prosecutor]: And what did you do with him at that point?

"[The Witness]: He was handcuffed, placed in the rear of the car. Detective Julio Lopez drove the car back to Danbury. I sat next to [the defendant].

"[The Prosecutor]: Did you advise [the defendant] of anything?

"[The Witness]: Of his *Miranda* warnings. His rights.

"[The Prosecutor]: And did you ask him to talk about the shooting?

"[The Witness]: Yes.

"[The Prosecutor]: And did he indicate surprise? Did he say: 'What shooting are you talking about?' What was his response?

"[The Witness]: His response was, 'I don't know what I should do right now.' And then he just stopped talking.

"[The Prosecutor]: And did you say anything more at that point?

"[The Witness]: Basically, not on the ride. The only conversation was [that] he was still questioning how we located him. We returned to the police station and started the arrest process of fingerprinting, photographs. And during this time, I explained to him that if the gun turned up in some child's hands or in someone else's hands, and someone else got hurt by the weapon, that his problems would grow. He'd have much bigger problems that—we wanted him to help us find the weapon. He didn't say anything.

"[The Prosecutor]: Did you allow him to make a phone call?

"[The Witness]: I did.

"[The Prosecutor]: And did he indicate to you any desire to make further phone calls?

"[The Witness]: Yes. Once he found out what his bond was, he made a phone call, I believe, to Chantay. And he asked if he'd be able to make another phone call before he went to court the next morning. I told him that my partner and I, we'd been working days. And we—if everything—if time permitted, we'd come down and let him make another phone call if he needed to.

* * *

"[The Prosecutor]: [The next day] did he, in fact make a phone call?

"[The Witness]: Yes.

"[The Prosecutor]: And after he made the phone call, what happened?

"[The Witness]: At the time he was making—getting ready to make the phone call, he looked at me and said, 'Lydia knows who has the gun.' I asked—I said, you know, 'You remember being read your rights?' He said, 'Yes.' And then he made his phone call—I believe to Chantay. She wasn't in. He had to—he was told to call back in fifteen or twenty minutes, that she'd be back.

"So, he sat down to wait, to make the second phone call, and he told us that when he returned to the house that day, he gave the gun to a Hispanic male named 'Flocko' and that Lydia could help us find who Flocko really is to retrieve the weapon.

"He felt bad. He said that he—something to the effect that he never meant for Macho[3] to get hurt, he had no problems with Macho, that he fired the gun, but he didn't want Macho to get hit.

"He just gave us a vague description of this Flocko. He wasn't sure that Flocko was really the real street name, but that, again, he said that Lydia would be able to help us find the person's real name." The defendant did not object to the direct examination.

During rebuttal argument to the jury, the prosecutor argued in part: "What's the state asking you to concentrate on? The sketch. The [identifications]. The two [identifications]: Sylvanus Thompson, Michael Whitaker. Plus, Lydia Taylor and Antwaun Curry; you have their statements. Read them over. You got the note [that the defendant wrote to a cell mate while in pretrial incarceration that was confiscated by authorities].[4] Look at it.

"What I haven't touched on yet is the defendant's actions. Think about that. What did Detective Trompetta testify to [concerning] when they found [the defen-

---

[3] Macho is Thompson's street name.

[4] See part II B.

dant] in the apartment in Waterbury? What was the first thing [the defendant] said? 'How did you find me? How did you find me?'

"Well, if you don't believe the alibi, if you believe he was there, but you're saying, jeez, I don't know, maybe he was there, but he didn't do the shooting, why would he—wouldn't you want to stay so you didn't get blamed for something, especially if you know you have [had a dispute] with this person? And then, why would the first thing out of your mouth—wouldn't it be like, 'What are you here for, officer?' Not, 'How did you find me?' And then later, [the defendant] says to the officer, the next day, 'I didn't mean for Macho to get hurt. I'm sorry. Lydia knows where the gun is.'" The defendant did not object to the final argument.

On appeal, the defendant seeks review of his *Doyle* claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). The record is adequate for our review, and the *Doyle* claim is of constitutional magnitude. Therefore, we will afford it review. Because the claim raises a question of law, our standard of review is plenary. See *State* v. *Saucier*, 90 Conn. App. 132, 144, 876 A.2d 572, cert. granted on other grounds, 275 Conn. 928, 883 A.2d 1251 (2005). The state argues that its examination of Trompetta and rebuttal argument did not violate *Doyle* and that, to the extent that the defendant also raises a claim grounded in the common-law rules of evidence,[5] it does not rise to the level of a constitutional violation and is therefore not reviewable. We agree with both of the state's assertions.

The defendant specifically argues that the state sought to use his postarrest and post-*Miranda* silence to create an inference of guilt from his failure to deny

[5] The defendant relies, in part, on *State* v. *Leecan*, 198 Conn. 517, 526–27, 504 A.2d 480 (postarrest silence inadmissible under principles of law of evidence), cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986).

involvement in the shooting, particularly when the prosecutor asked Trompetta whether the defendant had asked, "What shooting are you talking about?" The defendant claims that that question was improper because the state knew he had not asked the question and that it merely was designed to imply that he knew why the police had come to arrest him. Furthermore, at the time the prosecutor asked the question, he was aware that the defendant would assert an alibi defense. The state's questions, according to the defendant, were designed to use his silence against him to rebut his alibi. In support of his argument, the defendant relies on *State* v. *Morrill*, 197 Conn. 507, 498 A.2d 76 (1985), in which our Supreme Court stated: "Where . . . the accused is in custody, our law accords him the right to reply to question or statement, or to remain silent. His silence under such circumstances cannot be laid in evidence against him." (Internal quotation marks omitted.) Id., 535. We disagree with the defendant's argument.

"In *Doyle* v. *Ohio*, supra, 426 U.S. 619, the United States Supreme Court held that the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the [d]ue [p]rocess [c]lause of the [f]ourteenth [a]mendment. The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony. . . . As such, silence following *Miranda* warnings is insolubly ambiguous because it may constitute a reliance upon those rights rather than a tacit admission that the accused has an insufficient defense or explanation for his conduct." (Citation omitted; internal quotation marks omitted.) *State* v. *Alston*, 272 Conn. 432, 440–41, 862 A.2d 817 (2005).

"Our Supreme Court has held, however, that the [*Doyle*] rule does not apply when the defendant merely pauses during an interview or alternates between remaining silent and speaking: While a defendant may invoke his right to remain silent at any time, even after he has initially waived his right to remain silent, it does not necessarily follow that he may remain selectively silent. . . . In [*State* v. *Talton*, 197 Conn. 280, 296, 497 A.2d 35 (1985)], the defendant answered a question from the police by explaining, I'd rather not tell you. I don't want to tell you. . . . In that case, the trial court permitted a police officer to testify at trial that the defendant had made those statements after having received the *Miranda* warnings. . . . The court found that the defendant had not invoked his right to silence; [h]e just chose not to give that information. . . . The Supreme Court affirmed the decision of the trial court." (Citations omitted; internal quotation marks omitted.) *State* v. *Torres*, 85 Conn. App. 303, 315–16, 858 A.2d 776, cert. denied, 271 Conn. 947, 861 A.2d 1179 (2004).

In *State* v. *Moye*, 177 Conn. 487, 418 A.2d 870, vacated and remanded on other grounds, 444 U.S. 893, 100 S. Ct. 199, 62 L. Ed. 2d 129, on appeal after remand, 179 Conn. 761, 409 A.2d 149 (1979), the state elicited testimony from a detective investigating the case that the defendant was interviewed at the police station and had waived his right to remain silent. Id., 493–94. The interview ended when the defendant stated that he wanted to stop the interview and talk to his attorney. Id., 493. The police respected the request. Our Supreme Court concluded that "[t]he evidence was presented by the state to show the investigative effort made by the police and the sequence of events as they unfolded"; id., 499; not for the impermissible purpose of impeaching the defendant.

Our Supreme Court recently reaffirmed those *Doyle* exceptions in *State* v. *Cabral*, 275 Conn. 514, 881 A.2d

247 (2005). "References to one's invocation of the right to remain silent [are] not always constitutionally impermissible . . . . Thus, we have allowed the use of evidence of a defendant's invocation of his fifth amendment right in certain limited and exceptional circumstances. . . . In particular, we have permitted the state some leeway in adducing evidence of the defendant's assertion of that right for purposes of demonstrating the investigative effort made by the police and the sequence of events as they unfolded . . . as long as the evidence is not offered to impeach the testimony of the defendant in any way." (Citations omitted; internal quotation marks omitted.) Id., 524–25. The facts here do not violate the precepts of *Doyle* and conform to the limited and exceptional circumstances permitted.

Here, we first conclude that the challenged direct examination of Trompetta falls within the *Doyle* exceptions discussed in *Torres* and *Moye*. Trompetta's testimony revealed the sequence of events that occurred after he located the defendant at a Waterbury apartment; the purpose of Trompetta's testimony was not to impeach the defendant. In addition, the defendant did not tell the police that he wanted to remain silent, but that he did not know what to say in response to Trompetta's question about the shooting. Furthermore, the defendant vacillated between speaking and silence. After telling Trompetta that he did not know what to say, the defendant continued to question how the police had found him. At the police station, the defendant asked to make telephone calls and, after making one of the calls, told Trompetta about Flocko and that Taylor knew who had the gun. He also expressed remorse about Thompson's injury and said that he did not intend to shoot Thompson, which was, in essence, a confession.

We apply the same reasoning to the defendant's claim of improper argument to the jury. The defendant con-

tends that the state's rebuttal argument focused on the negative, that is, what he did not say. We conclude, after reviewing the state's rebuttal argument, that the prosecutor was using a rhetorical device to marshal the evidence for the jury, asking the jury to compare what the defendant did and did not do or say and the inferences that could be drawn from the evidence in the face of his alibi defense. The further flaw in the defendant's argument is that the seed planted in the jurors' minds that implicated him in the shooting most likely was his initial statement to Trompetta, i.e., "No one knows where I am. How did you find me?" That statement occurred before the defendant received the *Miranda* warning.

Even if the state's questioning and the rebuttal argument were improper, which we have concluded they were not, "*Doyle* violations are . . . subject to harmless error analysis. *South Dakota* v. *Neville*, 459 U.S. 553, 103 S. Ct. 916, 74 L. Ed. 2d 748 (1983) . . . . The harmless error doctrine is rooted in the fundamental purpose of the criminal justice system, namely, to convict the guilty and acquit the innocent. . . . Therefore, whether an error is harmful depends on its impact on the trier of fact and the result of the case. . . . [B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. . . . The state bears the burden of demonstrating that the constitutional error was harmless beyond a reasonable doubt. . . . That determination must be made in light of the entire record. . . .

"A *Doyle* violation may, in a particular case, be so insignificant that it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict without the impermissible question or comment upon a defendant's silence following a *Miranda* warning. Under such circumstances, the state's use of a defen-

dant's postarrest silence does not constitute reversible error. . . . The [error] has similarly been [found to be harmless] where a prosecutor does not focus upon or highlight the defendant's silence in his cross-examination and closing remarks and where the prosecutor's comments do not strike at the jugular of the defendant's story. . . . The cases wherein the error has been found to be prejudicial disclose repetitive references to the defendant's silence, reemphasis of the fact on closing argument, and extensive, strongly-worded argument suggesting a connection between the defendant's silence and his guilt." (Citations omitted; internal quotation marks omitted.) *State* v. *Daugaard*, 231 Conn. 195, 211–13, 647 A.2d 342 (1994), cert. denied, 513 U.S. 1099, 115 S. Ct. 770, 130 L. Ed. 2d 666 (1995).

As the state points out, the case against the defendant was strong. Curry sought out Whitaker to fight with the defendant, which indicates that the defendant had a motive to engage in violent behavior, if not specifically to shoot Thompson. Thompson identified the defendant to police at the scene as having been the shooter. Whitaker saw flashes of light coming from the front passenger seat of the Xterra, where he had seen the defendant sitting. Taylor's signed statement to police; see part II; indicates that the defendant was the shooter. The defendant was surprised to see the police at his door in Waterbury because no one was to know where he was. The defendant also told Trompetta that he had given the gun to Flocko and that Taylor knew how to find Flocko. Finally, the defendant told Trompetta that he was sorry that Thompson had been hurt and that he had fired the gun, but had not wanted to hit Thompson. As to the defendant's alibi defense, the jury may have found it weak. The rebuttal witnesses could not give a consistent story. Furthermore, the remarks of the prosecutor during rebuttal argument were not repeated references to the defendant's failure to answer one of

Trompetta's questions and were not used to attack the defendant's alibi. We conclude, therefore, that the state has demonstrated that any *Doyle* violation, although we have concluded that there was none, was harmless beyond a reasonable doubt.

## II

The defendant claims that the court abused its discretion by admitting into evidence (1) a written statement signed by Taylor and (2) an unsigned document. We review evidentiary claims under the abuse of discretion standard; see, e.g., *State* v. *Muhammad*, 91 Conn. App. 392, 404, 881 A.2d 468 (2005); and conclude that the court in this matter did not abuse its discretion by admitting the documents at issue.

## A

The defendant's first evidentiary claim is that the court abused its discretion by admitting a written statement that was sworn to and signed by Taylor as a prior inconsistent statement and for its substance pursuant to *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). The defendant claims that the statement was unreliable because Taylor was under the influence of drugs when she signed it, was afraid of being charged and had not read the statement before she signed it. We do not agree.

The following facts are relevant to this claim. Subsequent to the shooting, Taylor signed a written statement that she had given to Trompetta. At trial, the state called Taylor, who was thirty-seven years old, as a witness. She testified that on the day of the shooting, she had received a telephone call from the defendant, asking her to drive him to the center. She drove Curry and the defendant, who sat in the front passenger seat, to the center. On arrival, Curry went into the center and

returned, but Taylor could not remember anything else that occurred. The prosecutor showed Taylor a copy of her statement to refresh her recollection. Taylor then testified that she recalled seeing children going into and coming out of the center, seeing someone fall down in the alley and hearing gunshots. She could not recall any other details. The state offered her signed statement into evidence pursuant to *State* v. *Whelan,* supra, 200 Conn. 753, and *State* v. *Portee,* 55 Conn. App. 544, 740 A.2d 868 (1999), cert. denied, 252 Conn. 920, 744 A.2d 439 (2000).

Thereafter, defense counsel conducted a voir dire of Taylor. Taylor testified that at the time she gave the statement, she was under the influence of alcohol and drugs and that she did not make the statements in the document. She also did not want to be in the police station at the time she gave the statement. Defense counsel objected to the statement's being placed in evidence because the circumstances under which the statement was given raised questions as to its reliability. The state asked the court to conduct a hearing pursuant to *State* v. *Mukhtaar,* 253 Conn. 280, 306–307, 750 A.2d 1059 (2000). The court agreed to conduct a *Mukhtaar* hearing.

The state called Trompetta to testify about the circumstances under which he had taken the statement. Trompetta testified that he had had a telephone conversation with Taylor, which she had initiated shortly after the shooting, in which she had recounted the events of the night in question. Trompetta asked Taylor to come to the police station to give a statement. Trompetta informed Taylor that she possibly could be in trouble as the operator of the Xterra if she did not provide a statement.

Taylor went to the police station on March 24, 2003, three or four days after her telephone conversation.

Trompetta first read Taylor her rights, and Taylor signed the rights form. Taylor signed a statement, after reading it, that she was giving the statement without threat, fear or promise and that she had been warned that giving a false statement to a police officer is a violation of Connecticut law. To obtain the statement, Trompetta spent about forty minutes in a confined space with Taylor. During that time, Trompetta observed Taylor's demeanor. She did not appear to be under the influence of drugs or alcohol. Trompetta was familiar with Taylor and knew that she was on probation for violation of narcotics laws. Taylor's written statement was consistent with what she had told Trompetta during their telephone conversation.

Defense counsel then called Taylor, who testified that she had smoked crack cocaine on March 19, 2003, and had been on a three day binge. As a result of having ingested cocaine, Taylor did not pay attention to what was going on. She denied being afraid of the defendant or his family. The state then called Richard Lindberg, an inspector in the office of the state's attorney. Lindberg had served Taylor with a subpoena to testify in this case by leaving it at her home in Danbury. Taylor then contacted Lindberg through her prison counselor to say that she was afraid to testify in this case because she was afraid of the defendant and his family.

At the conclusion of the hearing, the court found that the circumstances under which Taylor's statement was taken were reliable. Specifically, the court found that on March 21, 2003, Taylor telephoned Trompetta, a member of the Danbury police force with nine years of narcotics experience, and informed him that she wanted to talk about the shooting at the center. Taylor went to the police station on March 24, 2003, as requested by Trompetta. Taylor read her rights and indicated that she had completed the eleventh grade and that she could read and write. She signed the rights

form. She gave a statement that was typed and that she signed. In Trompetta's opinion, Taylor did not appear to be under the influence of alcohol or drugs at the time she gave her statement. The court also found that Taylor denied that she knew what she was doing when she gave the statement, that she claimed to have been high, that she felt coerced to sign the statement, that she never read the statement and that she really did not know what was going on. The court found that Trompetta's testimony was reliable and that Taylor had been advised of her rights prior to giving the statement. The court found that the circumstances under which Taylor gave the written statement to Trompetta were reliable. The court overruled the defendant's objection to the admission of the statement under *Whelan*, citing *State* v. *Mukhtaar*, supra, 253 Conn. 280, and *State* v. *Anderson*, 74 Conn. App. 633, 813 A.2d 1039, cert. denied, 263 Conn. 901, 819 A.2d 837 (2003), in support of its ruling. The clerk then read Taylor's signed and sworn statement to the jury.[6]

---

[6] Taylor initialed and signed the following sworn, written statement: "I am voluntarily providing this statement to Danbury Police Detectives [Randy] Salazar and Trompetta. Det. Trompetta is typing the statement based on what I tell him. On Wednesday evening about 7 PM I got a call on my cell phone . . . from this guy I know, named Danny. I haven't known him all that long I'd say maybe a couple of weeks. Danny told me he needed a ride from the 'Brook' (Eden Dr.) to the Harambee Center on West St. I drove from my house to the 'Brook' in my friend Tara Mejia's Nissan Xterra which is red color and it has a New York registration. I was alone and when I got down to the 'Brook' I found Danny and Tuany and they got into the car I was driving. Tuany I have known many years, he is the son of my friend Jeannette Rollins. Danny had his hair pulled back and was wearing a 'do rag' on his head. Danny sat in the front passenger seat and Tuany in the back. They told me they had to get to the center before it closed and I drove there and parked towards the back. They were talking about a fight between Danny and Michael Whittaker. I heard that I got pissed off, 'I said you rushed me here over a fight'. Tuany got out of the car and went back and forth to the center this happened several times. Finally a few guys were standing outside the center, Tuany got back in the rear of the XTerra and Danny told me to 'drive'. I started to move and Danny pulled out a silver gun and began firing it maybe 3 or 4 shots. We took off out of the parking lot onto Deer Hill Ave. across the street from City Hall, I turned right and drove around

"The admissibility of evidence, including the admissibility of a prior inconsistent statement pursuant to *Whelan*, is a matter within the wide discretion of the trial court. . . . On appeal, the exercise of that discretion will not be disturbed except on a showing that [it] has been abused." (Citation omitted; internal quotation marks omitted.) *State* v. *Anderson*, supra, 74 Conn. App. 645–46.

*Whelan* permits the "substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination." *State* v. *Whelan*, supra, 200 Conn. 753. In *Whelan*, our Supreme Court created a hearsay exception for a relatively narrow category of prior inconsistent statements "that carry such substantial indicia of reliability as to warrant their substantive admissibility. As with any statement that is admitted into evidence under a hearsay exception, a statement that satisfies the *Whelan* criteria may or may not be true *in fact*. But, as with any other statement that qualifies under a hearsay exception, it nevertheless is admissible to establish the truth of the matter asserted because it falls within a class of hearsay evidence that has been deemed sufficiently trustworthy to merit such treatment. Thus, as with all other admissible nonhearsay evidence, we allow the fact finder to determine whether the hearsay statement is credible upon consideration of all the relevant circumstances. Consequently, once the proponent of a prior inconsistent statement has established that the statement satisfies the requirements of *Whelan*, that statement, like statements satisfying the requirements of other hearsay exceptions, is presumptively admissible.

to George St. where I dropped off Tuany and Danny together. I then drove home and gave Tara back her car. I didn't know anyone was shot until the next morning. Then I called Aaron Thompson who is the brother of the boy shot and we contacted the police."

"Of course, a prior inconsistent statement that fulfills the *Whelan* requirements may have been made under circumstances so unduly coercive or extreme as to grievously undermine the reliability generally inherent in such a statement, so as to render it, in effect, not that of the witness. In such circumstances, the trial court must act as a gatekeeper to ensure that the statement does not go to the jury for substantive purposes. [Our Supreme Court] emphasize[d], however, that the linchpin of admissibility is reliability: the statement may be excluded as substantive evidence only if the trial court is persuaded, in light of the circumstances under which the statement was made, that the statement is so untrustworthy that its admission into evidence would subvert the fairness of the fact-finding process. In the absence of such a showing by the party seeking to exclude a statement that meets the *Whelan* criteria, the statement is admissible as substantive evidence; like all other evidence, its credibility is grist for the cross-examination mill. Thus, because the requirements that [our Supreme Court] established in *Whelan* provide a significant assurance of reliability, it will be the highly unusual case in which a statement that meets the *Whelan* requirements nevertheless must be kept from the jury." (Emphasis in original.) *State* v. *Mukhtaar*, supra, 253 Conn. 306–307.

In this case, the court followed the procedure established by our Supreme Court to fulfill its gatekeeping responsibility pursuant to *Mukhtaar* to ensure the reliability of Taylor's written statement. "If a statement meets the four *Whelan* requirements, it will be deemed admissible, unless the party seeking to exclude it makes a preliminary showing of facts that, if proven true, would grievously undermine the statement's reliability. If such a showing has been made—and we leave the methods and contours of such a showing to the discretion of the trial court—the court should then hold a

hearing to determine the truth of those facts and whether they do, in fact, grievously undermine the reliability of the statement. The ultimate question for the trial court, therefore, is whether, notwithstanding the statement's satisfaction of the *Whelan* requirements, the circumstances under which the statement was made nonetheless render it so unreliable that a jury should not be permitted to consider it for substantive purposes. Id., 307 n.27. [T]he trial court's factual findings on this issue will not be disturbed on appeal unless they are clearly erroneous. Id., 307 n.26." (Internal quotation marks omitted.) *State* v. *Anderson*, supra, 74 Conn. App. 650. Questions of credibility are to be determined by the trier of fact, not by an appellate court on review. See *Sargent* v. *Smith*, 272 Conn. 722, 728–29, 865 A.2d 1129 (2005).

On the basis of our review of the record, including the transcript of Taylor's testimony and the *Mukhtaar* hearing, we conclude that the court's findings of fact were not clearly erroneous and that the court properly concluded that the circumstances under which Taylor's written statement was taken did not render it unreliable. The court, therefore, did not abuse its discretion by admitting Taylor's signed, written statement for substantive purposes.

B

The defendant's second evidentiary claim is that the court improperly admitted into evidence an unsigned note that the defendant had passed to a cell mate during pretrial incarceration. We are not persuaded.

The following facts pertain to this claim. During trial, the defendant submitted a motion in limine seeking to preclude the state from introducing a note written by the defendant into evidence. The court held a hearing outside the presence of the jury to consider the motion in limine. Luis Irizarry, a major in the department of

correction (department) assigned to the Bridgeport Correctional Center at the time of the incident, testified. He had been with the department for eighteen years and, prior to being assigned to the correctional center, had been the coordinator of gang intelligence and had overseen the telephone monitor unit. On the basis of his experience, Irizarry was familiar with the department's policies and procedures concerning the use of telephones and mail. Except for telephone calls to legal counsel, which an inmate may make on an unmonitored line, each inmate is permitted to make telephone calls to individuals on an allowed call list. Gibson's telephone number was on the defendant's allowed call list.

Inmates are assigned a personal identification number that enables them to make calls and clearly indicates for department monitoring purposes who is making the call. According to Irizarry, inmates attempt to avoid the telephone monitoring by, among other means, asking others to make calls for them or to use their personal identification number. By having another inmate use one's personal identification number, an inmate may avoid having the department directly monitor his or her conversation and the message conveyed. Irizarry also testified that in order to protect the safety and security of the correctional center, inmates are not permitted to pass notes, known as kites, between one another or to the general public. If an inmate needs something, he or she must make an oral request.

Kevin Pieterski, an employee of the department with six years of experience, testified as to his observations in the correctional center on September 15, 2003. At approximately 9 p.m., Pieterski saw the defendant secretively slip something in his closed fist to another inmate. Pieterski was concerned, approached the inmate and asked him to hand over whatever the defendant had given to him. The inmate gave Pieterski a small piece of paper with writing on it. Pieterski confis-

cated the paper and turned it over to the correctional center investigator. Pieterski did not see the defendant write on the paper. The court took judicial notice that the defendant's trial started on September 16, 2003.

The note stated: "203 . . . Chantay. Dees girl. Tell her I told my lawyer Chachi seen me at NY between 9:50 and 10:00. That night. And tell her to tell Chachi what I was wearing. Its a emergency I'll return the favor when ever. Tonite if you want it. She needs to know tonite. Im about to start trial." The state argued that the note should be admitted as evidence of the defendant's effort to create an alibi and that if the defendant had seen Chachi on the night of the shooting, there would be no need for Gibson to tell Chachi what the defendant was wearing. The state noted that a false statement made by a defendant tending to exculpate him requires that the court instruct the jury on consciousness of guilt. The state cited *State* v. *Jackson*, 257 Conn. 198, 777 A.2d 591 (2001), *State* v. *Reid*, 193 Conn. 646, 480 A.2d 463 (1984), and *State* v. *Rosado*, 52 Conn. App. 408, 726 A.2d 1177 (1999), in support of its argument. The defendant argued that the facts of *Reid* and *Jackson* are distinguishable, that the state had failed to establish that the defendant authored the note or asked someone else to do so, that the content of the note was relevant to the charges and that the prejudicial value of the note outweighed its probative value.

The court concluded that several inferences could be drawn from the note, given the manner in which the note was taken from the defendant and its context, one of which was an effort by the defendant to establish an alibi. The court found that the message was directed to the defendant's girlfriend, Gibson, and that her telephone number was on the paper.[7] The court also found

---

[7] Curry had testified as to Gibson's telephone number.

that the note was relevant to the issue of consciousness of guilt and admitted it as an exhibit for the jury to see.

On appeal, the defendant argues that the message on the note was not relevant to any of the crimes with which he was charged and argues for the first time on appeal that evidence concerning the note was unduly prejudicial because it revealed to the jury the fact that he was incarcerated. We decline to review the defendant's claim of prejudice related to his incarceration because it was not raised at trial, where the court might have considered the claim and given a curative instruction if necessary.

"Section 4-3 of the Connecticut Code of Evidence provides that [r]elevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." (Internal quotation marks omitted.) *State* v. *Muhammad*, supra, 91 Conn. App. 405. "One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable." (Internal quotation marks omitted.) *State* v. *Coleman*, 241 Conn. 784, 788–89, 699 A.2d 91 (1997). "In a criminal trial, it is relevant to show the conduct of an accused, as well as any statement made by him subsequent to the alleged criminal act, which may fairly be inferred to have been influenced by the criminal act. . . . The state of mind which is characterized as guilty consciousness or consciousness of guilt is strong evidence that the person is indeed guilty . . . and, under proper safeguards . . . is admissible evidence against an accused." (Internal quotation marks omitted.) *State* v. *Pelletier*, 85 Conn. App. 71, 81, 856 A.2d 435, cert. denied, 272 Conn. 911, 863 A.2d 703 (2004).

We conclude that the court did not abuse its discretion by admitting the note into evidence, as it was relevant to the defendant's consciousness of guilt as to the charges alleged against him in this case. The note directed the defendant's fellow inmate to place a call to his girlfriend, Gibson, that very night. The situation was an emergency because the trial was about to start. The logic of the state's argument is clear as well. If Chachi had seen the defendant in New York, why was it necessary for Gibson to tell Chachi what the defendant was wearing? The note was admissible to show conduct inconsistent with a claim of innocence. Under the circumstances of this case, the court, considering the context and content of the note, quite properly could have concluded that in balancing its probative value against its prejudicial tendency, the scales weighed in favor of its admission. See, e.g., *State* v. *Reid*, supra, 193 Conn. 656.

"All adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . Prejudice is not measured by the significance of the evidence which is relevant but by the impact of that which is extraneous." (Citation omitted; internal quotation marks omitted.) *State* v. *Rosado*, supra, 52 Conn. App. 428. The message in the note was relevant to the defendant's state of mind, namely, his consciousness of guilt, on the eve before trial, and it contained nothing extraneous to prejudice him unduly.

## III

The defendant's third claim is that the prosecutor engaged in misconduct by denigrating the role of defense counsel during the evidentiary and final argument phases of the trial, by attempting to shift the burden of proof to the defendant and by misstating

the evidence at trial. We conclude that the defendant's claims are without merit.

When reviewing claims of prosecutorial misconduct, we engage in a two step process. "The two steps are separate and distinct: (1) whether misconduct occurred in the first instance; and (2) [if misconduct occurred] whether that misconduct deprived a defendant of his due process right to a fair trial." (Internal quotation marks omitted.) *State* v. *Stevenson*, 269 Conn. 563, 572, 849 A.2d 626 (2004). "The issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . [The court] must view the prosecutor's comments in the context of the entire trial." (Internal quotation marks omitted.) Id., 571. We apply what are known as the *Williams* factors when assessing prosecutorial misconduct. They are "the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted.) *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987).

A

Prosecutorial Misconduct Claims Regarding Evidence

The defendant has cited two instances of alleged prosecutorial misconduct that occurred during the evidentiary phase of the trial that he argues were an attempt to shift the burden of persuasion from the state to him.[8] During the examination of James Stevenson, a firearms examiner, the prosecutor asked whether defense counsel had asked that the shell casing found at

[8] It is beyond question that the state bears the burden of persuasion in a criminal trial. See, e.g., *State* v. *Padua*, 273 Conn. 138, 182, 869 A.2d 192 (2005).

the crime scene be examined for fingerprints. Defense counsel's objection to the question was sustained by the court. In this instance, prosecutorial misconduct did not occur. No improper evidence was presented to the jury. It would be a rare trial, indeed, if counsel for one side or the other did not pose an objectionable question, whether by design or inadvertence, the motive for which we have no way of determining. Our rules of practice provide a means to prevent improper questions from being answered. The rules of practice worked in this instance when defense counsel's objection to the question was sustained by the court. We will not speculate as to the reason the objectionable question was asked.

The second instance in which the defendant claims that the prosecutor sought to shift the burden of persuasion arose during the state's *redirect* examination of Trompetta. The line of questioning concerned whether activity in the booking area of the police station is videotaped, the reason for the videotaping, how long the videotapes are retained and whether and under what circumstances the state and defense counsel may subpoena videotapes. The defendant objected to this line of questioning on the basis of burden shifting, and the state responded that the defendant had opened the door to the questioning during cross-examination of Trompetta. The court heard argument and listened to the cross-examination of Trompetta during the luncheon recess, reviewed case law[9] and subsequently overruled the defendant's objection because, on cross-examination, the defendant skillfully had raised a question concerning the whereabouts of the videotape of him. The court concluded that the state should be able to resolve any ambiguity that the defendant may have raised in the minds of the jurors. No prosecutorial mis-

[9] *State* v. *Youdin*, 38 Conn. App. 85, 96–99, 659 A.2d 728, cert. denied, 234 Conn. 920, 661 A.2d 100 (1995).

conduct occurred in this instance either. To the extent that the defendant claims that the court abused its discretion by admitting the evidence, we decline to review that claim under the guise of prosecutorial misconduct.[10]

## B

### Prosecutorial Misconduct Claims Regarding Final Argument

The defendant claims that the prosecutor engaged in misconduct by asking the jurors to put themselves in the victim's place, arguing that stress heightens awareness and, during rebuttal argument, denigrating the role of defense counsel. On the basis of our review of the record, we conclude that the prosecutor did not engage in misconduct.

The state presented the case against the defendant as one in which the victim had identified the defendant as the person who had shot him. When he began his final argument, the prosecutor recounted the testimony of the officer who had responded to the scene first. Thompson told the officer that the defendant had shot him. The state argued, in part: "Because, remember what Officer Daniel A. Sellner said [when he testified]. He was there in a minute. And Sylvanus Thompson says to him, when he asked him, 'Who shot you?' He says, 'There were a couple of them.' 'Who?' 'Danny.' 'Who else?' 'Antwaun.' So, you would have to believe—or, do you believe that that makes sense? That that is logical? Any of you, if you were shot, lying in an alley with serious injuries, would you say . . . I don't know who shot me, and I'm not really that concerned if the police get the right guy, but I've had this problem—or my

---

[10] Furthermore, when the state completed its line of questioning after the court had ruled, the prosecutor did not ask Trompetta whether defense counsel had subpoenaed the videotapes, only whether the state had requested them.

friend's had this problem with [the defendant], so I'm going to blame him."

In essence, the prosecutor was asking the jurors to apply their common sense when evaluating the credibility of Thompson. Essentially, he questioned, given the seriousness of Thompson's injuries, what reason Thompson had to lie to the first person, a police officer, who came to his aid. Such a rhetorical device is not improper because it did not implore the jury to feel sympathy for the victim. The defendant did not dispute the seriousness of the injuries that Thompson sustained.

In addressing whether the defendant correctly was identified as the person who shot Thompson, the prosecutor recounted for the jury the situation that existed prior to the shooting. The defendant, Whitaker and Thompson knew each other; this, therefore, was not a question of the identification of a stranger. Curry had entered the center and asked Whitaker to come outside for a fair fight. The prosecutor then stated: "In regard to Michael Whitaker, think about this—and also in regard to Sylvanus Thompson. If you'd ever been in a fight before, or you've ever been in a situation like that, where you think there might be trouble, you think there might be a fight, *is your sense of awareness going to be heightened?* When they walked out into that alley, were they just, you know, walking along, not paying attention to anything? Or did they walk out into that alley thinking there might be a problem? They're saying [the defendant's] out there. He wants to fight. Are they really going to be focused and paying attention? So, think about that when you decide what their emotional and physical condition was when they made the identification." (Emphasis added.)

We disagree with the defendant's characterization of the argument. The prosecutor did not make an affirma-

tive statement that stress heightens awareness. He asked the jury to consider how vigilant Whitaker and Thompson may have been when they left the center. The prosecutor did nothing more than ask the jurors to rely on their experience when assessing the credibility of the witnesses, which is perfectly acceptable.

As to the defendant's claim that the prosecutor impugned or denigrated the role of defense counsel during rebuttal argument, we disagree with that contention. "While a prosecutor may argue the state's case forcefully, such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Consequently, the state must avoid arguments which are calculated to influence the passions or prejudices of the jury, or which would have the effect of diverting the jury's attention from [its] duty to decide the case on the evidence. . . . Such [a]n appeal to emotions may arise directly, or indirectly from the use of personal and degrading epithets to describe the defendant . . . and the defendant's right to a fair trial may be abridged by the repeated or flagrant use of such invective. . . . Furthermore, [t]he prosecutor is expected to refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel." (Citation omitted; internal quotation marks omitted.) *State* v. *Chasse*, 51 Conn. App. 345, 357–58, 721 A.2d 1212 (1998), cert. denied, 247 Conn. 960, 723 A.2d 816 (1999).

On the basis of our review of the final arguments given by the prosecutor and defense counsel, we cannot conclude that the state's argument, particularly the rebuttal argument, was improper. The prosecutor's rebuttal argument responded to the final argument of defense counsel. The prosecutor asked the jury to question, on the basis of the defense's argument, the defendant's theory. Was the defendant not there as he asserted through his alibi or was he there, but did not

pull the trigger, as defense counsel's argument implied? The transcript reveals a sufficient factual basis for the argument. Furthermore, the prosecutor's argument that the note that was confiscated in the correctional center was an effort on the part of the defendant to create a third alibi witness finds support in the evidence. In addition, we cannot conclude that the state attempted to shift the burden of proof by noting that defense counsel's final argument did not address evidence that contradicted Thompson's positive identification of the defendant as the shooter, which was the state's theory of the case.

As to his use of the phrase "big frame up" during rebuttal argument, the prosecutor was responding to the defense argument that "[t]he state introduced some evidence that actually wasn't even connected to this case. But it was designed to make you believe the defendant is guilty. Specifically, I'm talking about the so-called feud between [the defendant] and Michael Whitaker. . . . This is an attempted murder and assault with a firearm case. You need evidence that's more than a joke. You need proof beyond a reasonable doubt. And you don't have it in this case. Therefore, you have to find the defendant not guilty."

In addressing the testimonial evidence of Whitaker and Thompson, the prosecutor stated: "The other thing is, yet Michael Whitaker and Sylvanus Thompson, neither one of them say, definitively, I saw the gun in [the defendant's] hand. Well, if this was a big frame up, if they were out to get him, wouldn't they just say that, yeah, I clearly saw it. Clear as day, I saw the gun in his hand, and then I saw the flashes. Neither of them does. Consider that when you assess their credibility." With respect to the type of gun used in the shooting, the state argued, "But think about it, if the police officers were intent on framing up [the defendant], they don't have a gun yet." In both instances, the prosecutor was

directing the jury's attention to evidence in the case, trying to help the jury assess the evidence and the inferences to be drawn therefrom. His purpose was to rehabilitate the evidence that defense counsel had attacked during her closing argument.

"Closing arguments of counsel . . . are seldom carefully constructed *in toto* before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations. . . . Therefore, because closing arguments often have a rough and tumble quality about them, some leeway must be afforded to the advocates in offering arguments to the jury in final argument. [I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . [W]e must review the comments complained of in the context of the entire trial." (Citation omitted; emphasis in original.) *State* v. *Chasse*, 51 Conn. App. 358.

We conclude that when the jury heard the phrase frame up, it reasonably would have understood that it was "dramatic shorthand"; id., 359; for the defendant's attack on the state's theory of the case and lack of physical evidence linking the defendant to the shootings. The defendant's claim of prosecutorial misconduct, therefore, must fail.

The judgment is affirmed.

In this opinion the other judges concurred.