******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

STATE OF CONNECTICUT *v.* JOHN PJURA
(AC 41869)

Prescott, Elgo and Devlin, Js.

*Syllabus*

The defendant, who had been convicted of the crimes of assault in the second degree and larceny in the sixth degree, appealed to this court from the judgment of the trial court, claiming that he was deprived of his right to a fair trial because of prosecutorial impropriety and that the evidence was insufficient to prove that he intended to cause the victim, H, serious injury when he punched H in the head and fractured his skull. The defendant had attempted to leave a shoe store with a pair of sneakers he had not paid for. H, an assistant manager at the store, and R, a cashier there, observed the defendant leave the store without paying for the sneakers. H followed the defendant into a neighboring store, where he confronted him and told him that he would not call the police if he returned the sneakers. The defendant complied and, as they headed back to the shoe store, H became uncomfortable and radioed R to call the police. The defendant then used his dominant right hand to punch H in the head with a closed fist, after which the defendant fled in his car. D, a shopper at the neighboring store, heard the impact of the punch about fifteen to twenty feet away. *Held*:

1. There was sufficient evidence from which the jury could have reasonably found that the act of punching H directly in the head and with great force was strongly corroborative of the defendant's intention to cause serious physical injury in an effort to facilitate his escape; the punch caused a life-threatening injury, as it fractured H's skull in multiple places, rendered him unconscious and was heard by D fifteen to twenty feet away, and, although the defendant claimed that his intent was not to cause serious injury but to escape, he testified that he could have shoved H in the chest, punched him in the stomach, tripped him or tried running away rather than engaging in physical contact with H.

2. The defendant could not prevail on his claim that he was denied his right to a fair trial as a result of prosecutorial impropriety, as none of the challenged remarks was improper:

a. The prosecutor did not place evidence of the defendant's postarrest silence before the jury in violation of the trial court's orders, as the prosecutor asked C, a police detective, only about the defendant's conduct in response to C's request to photograph the defendant's hands during his detention by the police, the record was insufficient to determine if the prosecutor intended to elicit improper evidence as to postarrest silence, the question was open-ended, the type of evidence the prosecutor attempted to elicit was ambiguous, the court issued no formal ruling on a motion the defendant had filed to preclude evidence of his postarrest silence and instructed the jury that questions by the attorneys were not evidence; moreover, the prosecutor had a proper motive for asking the defendant on cross-examination if he felt remorse about the incident with H, as defense counsel's questions to the defendant on direct examination opened the door for the prosecutor's follow-up questions, and the prosecutor had a good faith basis to ask the defendant additional questions on recross-examination about his remorse, as the court previously had permitted the prosecutor on cross-examination to impeach the defendant's credibility as to his purported remorse.

b. The prosecutor invited the jury to draw reasonable inferences from the evidence and did not argue facts not in evidence during closing argument about the defendant's intent to cause H serious injury, as defense counsel did not object to the prosecutor's arguments, the defendant's testimony that he could have taken other action to get away and avoid arrest instead of punching H in the head supported the prosecutor's arguments, the prosecutor's arguments as to the defendant's motivation for shopping at H's store were not presented to the jury as facts but, instead, as a submission of a reasonable inferences the jury could draw from the facts and evidence, and the prosecutor's argument about the differing accounts of the incident by H and the defendant merely asked

the jury to make a credibility determination.

c. The prosecutor did not frame his statements to the jury by suggesting that it would need to find that R and D lied about the location of the defendant's punch in order to find the defendant not guilty: the prosecutor's statements, to which defense counsel did not object, asked the jury to weigh the credibility of each witness and did not force the jury to find the defendant not guilty only if first concluded that R and D had lied; moreover, even if R and D had lied, the jury could have found the defendant guilty on the basis of his testimony alone that he punched H in the head.

(*One judge concurring separately*)

Argued May 22—officially released October 20, 2020

*Procedural History*

Substitute information charging the defendant with one count each of the crimes of robbery in the first degree and assault in the second degree, brought to the Superior Court in the judicial district of Litchfield at Torrington and tried to the jury before *Danaher, J.*; verdict and judgment of guilty of assault in the second degree and the lesser included offense of larceny in the sixth degree, from which the defendant appealed to this court. *Affirmed.*

*James B. Streeto*, assistant public defender, with whom, on the brief, was *MarcAnthony Bonanno*, certified legal intern, for the appellant (defendant).

*Brett R. Aiello*, special deputy assistant state's attorney, with whom, on the brief, were *Dawn Gallo*, state's attorney, and *David R. Shannon*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. The defendant, John Pjura, appeals from the judgment of conviction, rendered after a jury trial, of one count of assault in the second degree in violation of General Statutes § 53a-60 (a) (1) and one count of larceny in the sixth degree in violation of General Statutes § 53a-125b. The defendant claims on appeal (1) that there was insufficient evidence to prove beyond a reasonable doubt that he intended to cause serious physical injury to the victim, and (2) that he was denied his right to a fair trial because the prosecutor committed improprieties during the trial by (a) attempting to place evidence of the defendant's postarrest silence before the jury, (b) arguing facts not in evidence, and (c) arguing to the jury that, in order to find the defendant not guilty, it would have to find that two eyewitnesses and the victim were lying. We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to our discussion. On September 11, 2016, the defendant attended church with his girlfriend, her son, and her friends, Kim Barnard and Jay Barnard. At some point, Kim Barnard came up with the idea of going to a fair in Bethlehem. The defendant was reluctant to go to the fair because he had a hole in his shoes and was not comfortable with the idea of walking around a muddy fairground with them. Upon hearing this, Kim Barnard suggested that the defendant buy new shoes at a nearby Payless Shoes store. The defendant did not have the ability to pay for his own shoes, so Kim Barnard gave the defendant's girlfriend her credit card so the defendant could buy shoes.

Following the church service, the defendant left with his girlfriend and her son to buy some sneakers. They went to the Famous Footwear store in Torrington. The defendant found a pair of sneakers he liked, and he tried them on. The defendant believed that he could sneak out of the store without paying for the sneakers. To accomplish this, he put his old shoes into the shoe box, left the store, and entered the neighboring Target store.

The victim, Andrew Howe, an assistant store manager at Famous Footwear, observed the defendant trying on the shoes. He then saw the defendant put his old shoes into the shoe box and place the box back on the shelf. The victim and Anna Rogers, a cashier, saw the defendant leave the store without paying for the sneakers. The victim followed the defendant out of the store and into Target. He confronted the defendant, told him that there were cameras everywhere within the store and that if the defendant returned the stolen shoes that he would not call the police. The defendant complied with the victim's directions, and the two headed back to

Famous Footwear without a struggle or argument. While heading back to the store, however, the victim, sensing that the mood had changed, became uncomfortable and radioed Rogers to call the police. The defendant then punched the victim in the head with his dominant right hand, sprinted to his vehicle, and drove away. The force of the punch was so strong that Mark Dalessandro, a shopper at Target, heard its impact from approximately fifteen to twenty feet away. The victim was unable to brace himself and immediately collapsed to the ground. He suffered serious injuries, including a depressed skull fracture and a subarachnoid hemorrhage. He underwent surgery to reconstruct his skull. As a result of his injuries, he had to relearn to walk and to talk and was unable to drive.

After the incident, Torrington police sent out a "be on the lookout" alert with a description of the suspect. They also published a photograph of the suspect on their Facebook page. On September 18, 2016, several members from the Barnards' church approached Jay Barnard with the photograph of the suspect from the Facebook page. Jay Barnard recognized the defendant from the photograph. He confronted the defendant later that day and asked him either to turn himself in to the police or to clear up the matter. The defendant denied that the photograph was of him. Following this conversation, the defendant began walking in the direction of the police department. He did not, however, turn himself in to the police and instead began wandering around the area.

Later that day, the Torrington police were dispatched after a concerned citizen reported the presence of a suspicious person in her backyard. The police located the defendant, but he managed to flee from them. Later that evening, the Torrington police were dispatched to a house where a suspicious person was reported to have been sleeping on a pantry floor. The officers located the suspicious person, who was identified as the defendant, and arrested him.

The defendant was charged with robbery in the first degree in violation of General Statutes § 53a-134 (a) (1) and assault in the second degree in violation of § 53a-60 (a) (1). The jury found the defendant not guilty of robbery but returned a guilty verdict on the lesser included offense of larceny in the sixth degree. The jury also found the defendant guilty of assault in the second degree. The court, *Danaher, J.*, sentenced the defendant to six years of imprisonment. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that there was insufficient evidence to prove beyond a reasonable doubt that he intended to cause serious physical injury to the victim. Specifically, the defendant asserts that there was no

direct or circumstantial evidence from which the jury reasonably could infer that he acted with the necessary intent. The defendant further argues that the evidence established only his intent to flee the scene to avoid being taken into police custody. We disagree.

We begin our analysis with the well established standard of review for assessing an insufficiency of the evidence claim. "In reviewing the sufficiency of the evidence to support a criminal conviction we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Papandrea*, 302 Conn. 340, 348–49, 26 A.3d 75 (2011).

"A person is guilty of assault in the second degree when: (1) With intent to cause serious physical injury to another person, the actor causes such injury to such person or to a third person . . . ." General Statutes § 53a-60 (a). "Serious physical injury" is statutorily defined as "physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ . . . ." General Statutes § 53a-3 (4). "Assault in the second degree under § 53a–60 (a) (1) is a specific intent, rather than a general intent, crime." *State* v. *Perugini*, 153 Conn. App. 773, 780 n.7, 107 A.3d 435 (2014), cert. denied, 315 Conn. 911, 106 A.3d 305 (2015). "Intent is a question of fact, the determination of which should stand unless the conclusion drawn by the trier is an unreasonable one. . . . [T]he [jury is] not bound to accept as true the defendant's claim of lack of intent or his explanation of why he lacked intent. . . . Intent may be, and usually is, inferred from the defendant's verbal or physical conduct. . . . Intent may also be inferred from the surrounding circumstances. . . . The use of inferences based on circumstantial evidence is necessary because direct evidence of the accused's state of mind is rarely available. . . . Intent may be gleaned from circumstan-

tial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading up to and immediately following the incident. . . . Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct." (Citations omitted; internal quotation marks omitted.) *State* v. *Andrews*, 114 Conn. App. 738, 744–45, 971 A.2d 63, cert. denied, 293 Conn. 901, 975 A.2d 1277 (2009).

Next, we examine the circumstantial evidence presented at trial from which the state contends a jury reasonably could infer that the defendant punched the victim with the intent to cause serious injury. The victim caught the defendant stealing the sneakers from Famous Footwear and instructed him to return them. While heading back to the store, the defendant became fearful of the prospect of going to jail and wanted to flee to evade responsibility for his actions. The defendant believed that the victim would continue to follow him if he tried to continue walking. As a result, the defendant threw a closed-fisted punch at the victim's head with his dominant right hand and fled the scene. The sound of the punch was audible to a bystander standing fifteen to twenty feet away. The punch was so hard that it knocked the victim unconscious and caused him to collapse to the ground without the ability to brace himself. The punch fractured the victim's skull in multiple places and was a life-threatening injury. Given these facts presented at trial, the jury reasonably could have found that the act of punching the victim directly and with great force in the head is strongly corroborative of an intention to cause serious physical injury. See *State* v. *Mendez*, 154 Conn. App. 271, 279, 105 A.3d 917 (2014) (rejecting defendant's insufficiency of evidence claim and holding that jury could have reasonably inferred that defendant intended to cause serious physical injury when defendant punched victim in jaw).

The defendant further argues that when he punched the victim, his intent was not to cause serious physical injury but, rather, that his sole intent was to escape. We are not persuaded. "The existence of an intent to escape does not necessarily negate the existence of an intent to cause serious physical injury when making the escape." *State* v. *Andrews*, supra, 114 Conn. App. 746. Under the factual circumstances of this case, the jury reasonably could have inferred that the defendant intended to cause the victim serious physical injury in an effort to facilitate his escape. The defendant testified that he intended only to avoid capture when he punched the victim. He also admitted, however, that he could have tried shoving the victim in the chest, punching him in the stomach, or tripping him to avoid going to jail. He further stated that he could have tried running away rather than engaging in any physical contact with the victim, although he noted that the victim might have

chased him if he attempted to flee because the victim appeared to be in good shape. From these facts, the jury reasonably could infer that the defendant believed it necessary to severely injure the victim in order to escape successfully. Such evidence permits a reasonable inference that, while the defendant was contemplating fleeing in order to avoid police involvement, he made an intentional decision to punch the victim in the head with great force in order to effectuate his escape. See id. (evidence permitted reasonable inference that defendant made intentional decision to turn car in direction of victim and to drive directly at him with intent to cause serious physical injury when attempting to escape). We therefore conclude that there was sufficient evidence from which the jury could have reasonably found that the defendant intended to cause serious physical injury to the victim.

## II

The defendant next claims that he was denied his right to a fair trial because the prosecutor committed improprieties during the trial by (1) attempting to place evidence of the defendant's postarrest silence before the jury, (2) arguing facts not in evidence, and (3) arguing to the jury that in order to find the defendant not guilty, it would have to find that two eyewitnesses and the victim were lying. Because we conclude that none of the challenged remarks was improper, we reject the defendant's claim.[1]

"The standard we apply to claims of prosecutorial impropriety is well established. In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . . [If] a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show . . . that the remarks were improper . . . ." (Internal quotation marks omitted.) *State* v. *Brett B.*, 186 Conn. App. 563, 573, 200 A.3d 706 (2018), cert. denied, 330 Conn. 961, 199 A.3d 560 (2019). "The defendant also has the burden to show that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." (Internal quotation marks omitted.) Id.

"To determine whether any improper conduct by the [prosecutor] violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*

[204 Conn. 523, 540, 529 A.2d 653 (1987)], with due consideration of whether that misconduct was objected to at trial. . . . These factors include the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Rios*, 171 Conn. App. 1, 52, 156 A.3d 18, cert. denied, 325 Conn. 914, 159 A.3d 232 (2017). With these principles in mind, we turn to whether the prosecutor's challenged remarks in the present case were improper.

A

The defendant first contends that the prosecutor improperly attempted to elicit evidence of the defendant's postarrest silence in direct violation of prior orders or rulings of the court that the state would not be permitted to question witnesses about the defendant's postarrest silence. Specifically, the defendant argues that the prosecutor violated these orders during his examination of Detective James Crean, who testified regarding the defendant's arrest and detention with the police, and during the prosecutor's cross-examination of the defendant in which he asked the defendant about whether he felt any remorse following the incident. The state responds that no impropriety occurred because the question to Detective Crean was open-ended, no answer was suggested, and no answer was elicited. Moreover, the state contends that defense counsel opened the door to the topic of remorse during direct examination, and that the prosecutor had a good faith basis for asking those questions due to the defendant's testimony on direct and redirect examination. On the basis of our review of the challenged remarks, we conclude that the prosecutor's conduct did not rise to the level of an impropriety.

The following additional facts are relevant to this claim. Prior to trial, the defendant filed a motion in limine seeking to bar the state from eliciting evidence of the defendant's postarrest silence pursuant to *Doyle* v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). The prosecutor acquiesced and indicated that he did not intend to offer such evidence. He stated that he intended to offer only evidence that the defendant initially failed to comply with Detective Crean's request to photograph his hands. The prosecutor further represented that he intended to ask Detective Crean questions relating only to the defendant's conduct, rather than any statements he made or did not make. In light of the prosecutor's representation, the court did not enter an order on the defendant's motion in limine, stating that "no other action is necessary regarding this motion."

During the state's presentation of evidence, the prosecutor called Detective Crean to testify. During Detective Crean's direct examination, the prosecutor asked, "[w]ell, did you attempt to speak with—did you attempt to interview [the defendant]?" Defense counsel immediately objected to this question and asked to approach the bench. After a sidebar discussion, questioning resumed without the prosecutor pursuing the question to which counsel had objected, from which it can be inferred that the court sustained the objection. In any event, no answer was ever provided in response to the objectionable question.

With respect to the issue of the defendant's remorse, defense counsel, during her direct examination of the defendant, asked him what his reaction was when he learned of the extent of the victim's injuries after he had been arrested. The defendant responded that he was "[d]evastated" and "shocked" because he "didn't think that [he] could ever do that much damage, it's crazy." On cross-examination, the prosecutor followed up on this testimony by asking, "[n]ow, you would agree with me, in regard to that video, you showed no signs of remorse in a sense you didn't look back to see if he was okay, right?" Defense counsel objected to that question, and the prosecutor responded that his question was meant to impeach the credibility of the defendant's purported remorse. The court overruled the objection. The prosecutor then posed the question again, and the defendant responded, "I just wanted to get away at that point, I was just scared, I just ran to the car."

On redirect examination, defense counsel asked the defendant if he had any remorse for his actions, and the defendant answered, "I'm deeply, deeply sorry about it. And I would never wish that upon anybody." On recross-examination, the prosecutor returned to this subject by asking the defendant, "at what point in time did you apologize to the manager?" The court sustained an objection to this question. The prosecutor then asked, "[a]nd don't answer this, there may be an objection; did you ever apologize to the manager?" The court sustained an additional objection, and then issued a limiting instruction to the jury regarding the questions concerning the defendant's remorse.[2]

It "is well settled that prosecutorial disobedience of a trial court order, even one that the prosecutor considers legally incorrect, constitutes improper conduct. . . . In many cases, however, this black letter principle is easier stated than applied. A prosecutor's advocacy obligations may occasionally drive him or her close to the line drawn by a trial court order regarding the use of certain evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *O'Brien-Veader*, 318 Conn. 514, 533, 122 A.3d 555 (2015). "Even when it is determined that a prosecutor has breached a trial court order, it can

be difficult to distinguish between a mere evidentiary misstep and a potential due process violation. . . . Not every misstep by a prosecutor that exceeds the bounds of a trial court order rises to the level of prosecutorial impropriety that implicates a defendant's due process rights, thus requiring resort to the second step in the prosecutorial impropriety analysis." Id., 534. "Whether a prosecutorial question or comment that runs afoul of a trial court order implicates a defendant's due process rights is a case specific determination. This determination turns on the degree to which the breach undermines a trial court's ruling that protects the integrity of the fact-finding process by restricting the admission of unreliable or unduly prejudicial evidence." Id.

We turn first to the defendant's argument that the prosecutor committed an impropriety by asking Detective Crean if he had interviewed the defendant. We conclude that the objectionable question posed by the prosecutor, under the circumstances here, did not constitute impropriety.

We note at the outset that there was no formal order on the defendant's motion in limine. On the basis of the prosecutor's representation that he intended to offer only evidence of the defendant's conduct in response to Detective Crean's request to photograph his hands, the court concluded that no further action was necessary on the motion in limine. Any attempt by the prosecutor to ask a question eliciting evidence of the defendant's postarrest silence, albeit objectionable, would thus not constitute a direct violation of a court order.

"It would be a rare trial, indeed, if counsel for one side or the other did not pose an objectionable question . . . . Our rules of practice provide a means to prevent improper questions from being answered. The rules of practice [work] . . . when defense counsel's objection to [a] question [is] sustained by the court." *State* v. *Camacho*, 92 Conn. App. 271, 297, 884 A.2d 1038 (2005), cert. denied, 276 Conn. 935, 891 A.2d 1 (2006). In the present case, defense counsel immediately objected to the challenged question, which resulted in a sidebar during which the court either sustained the objection or the prosecutor agreed to withdraw the question. The court also issued general instructions to the jury at the start of trial and after closing arguments in which it emphasized that questions, objections, arguments, and statements made by the attorneys were not evidence. Because we presume that jurors "follow the instructions given by a judge," we assume that the jury did not consider this question as evidence during its deliberation. (Internal quotation marks omitted.) *State* v. *Perez*, 147 Conn. App. 53, 111, 80 A.3d 103 (2013), aff'd, 322 Conn. 118, 139 A.3d 654 (2016). Accordingly, the prosecutor's question did not result in the jury hearing any evidence regarding the defendant's postarrest silence.[3] Moreover, the prosecutor immediately turned

to a different subject and did not ask additional questions that risked eliciting evidence regarding the defendant's postarrest silence.

Additionally, it is unclear whether the prosecutor intended to elicit evidence regarding the defendant's postarrest silence by asking the challenged question to Detective Crean. The prosecutor's question was open-ended, and the type of evidence that he was attempting to elicit from Detective Crean was ambiguous. Although there is no direct evidence of the prosecutor's intent, it is possible that the prosecutor had a tangible, good faith basis for asking the question. For example, the prosecutor had indicated at the hearing on the motion in limine that he intended to elicit testimony regarding the defendant's conduct in response to Detective Crean's request to photograph his hands. It is thus possible that the question regarding whether Crean had interviewed the defendant was nothing more than a poorly phrased and ill-advised attempt to place a legitimate line of inquiry before the jury.[4] The prosecutor, therefore, may not necessarily have had any improper motive for asking such a question. Indeed, this is not a case in which we have direct evidence of the prosecutor's intent to ask a question in direct violation of a court order. See *State* v. *Reynolds*, 118 Conn. App. 278, 293, 983 A.2d 874 (2009) (concluding that prosecutor's questions improperly violated trial court order because prosecutor's representations to court revealed that she intended to elicit evidence court had expressly disallowed), cert. denied, 294 Conn. 933, 987 A.2d 1029 (2010). On the basis of the record, we have no way of determining the prosecutor's actual motive for asking this question, and we need not engage in needless speculation as to the reason the objectionable question was asked in the absence of direct evidence of the prosecutor's intent. See *State* v. *Camacho*, supra, 92 Conn. App. 297. Because the record is unclear as to what the prosecutor's motive was for asking the challenged question, the record is insufficient to determine whether the prosecutor was attempting to elicit improper evidence regarding the defendant's postarrest silence.[5]

We next turn to the defendant's contention that the prosecutor's questions regarding the defendant's remorse were improper. "Generally, a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject. . . . The party who initiates discussion on the issue is said to have opened the door to rebuttal by the opposing party. Even though the rebuttal evidence would ordinarily be inadmissible on other grounds, the court may, in its discretion, allow it where the party initiating inquiry has made unfair use of the evidence. . . . This rule operates to prevent a defendant from successfully excluding inadmissible prosecution evidence and then selectively introducing pieces of this evidence for his own advantage, without

allowing the prosecution to place the evidence in its proper context. . . . The doctrine of opening the door cannot, of course, be subverted into a rule for injection of prejudice. . . . The trial court must carefully consider whether the circumstances of the case warrant further inquiry into the subject matter, and should permit it only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence. . . . Thus, in making its determination, the trial court should balance the harm to the state in restricting the inquiry with the prejudice suffered by the defendant in allowing the rebuttal." (Internal quotation marks omitted.) *State* v. *Brown*, 309 Conn. 469, 479, 72 A.3d 48 (2013).

Here, the defendant, when asked during direct examination by his counsel about his reaction to learning the extent of the victim's injuries, testified that he was "[d]evastated" and "shocked." Such testimony opened the door for the prosecutor to ask him follow-up questions about his remorse. In response to an objection from defense counsel, the prosecutor stated that his question was meant to examine the credibility of the defendant's purported remorse. It is thus clear from the record that the prosecutor had a proper motive for asking the defendant about his remorse for this particular question and that he was not attempting to elicit evidence of the defendant's postarrest silence. As a result, it cannot be said that he acted improperly in asking this question.

Although the trial court later sustained defense counsel's objections to two additional questions asked by the prosecutor during recross-examination regarding the defendant's remorse, when considered in context, neither of these questions constitutes prosecutorial impropriety. The issue of remorse arose again during the redirect examination of the defendant, and the prosecutor's questions on recross-examination were in direct response to that testimony. Although the court ultimately sustained the objections to the questions, we conclude that the prosecutor did not engage in impropriety by asking them, particularly in light of the fact that the court had earlier permitted the prosecutor to impeach the defendant's credibility as to his purported remorse during cross-examination.

During argument conducted in the absence of the jury, defense counsel asked the court to issue a curative instruction as to the prosecutor's questions concerning remorse. In response, the prosecutor told the court that he believed his questions during recross-examination were fair game because the defendant had testified that he was remorseful and that he was merely trying to test the defendant's credibility in making these statements. On the basis of these representations, and the consideration that the defendant had opened the door to the issue of his remorse on direct and redirect exami-

nation, the prosecutor had a good faith basis for asking additional questions on the subject. See *Edwards* v. *Commissioner of Correction*, 141 Conn. App. 430, 441, 63 A.3d 540 (no prosecutorial impropriety when prosecutor had good faith basis for asking questions to impeach defendant's credibility), cert. denied, 308 Conn. 940, 66 A.3d 882 (2013). Accordingly, the prosecutor's questioning did not constitute impropriety because he had good faith reasons for asking these questions and was not trying to improperly elicit evidence of the defendant's postarrest silence. In light of these considerations, we conclude that none of the prosecutor's questions concerning the defendant's remorse were improper.

In sum, we conclude (1) that no improper evidence was presented to the jury when the prosecutor asked Detective Crean if he had attempted to interview the defendant, (2) that the record is unclear regarding whether the prosecutor intended to offer evidence of the defendant's postarrest silence, (3) that, even if we assume that the question was improper, the defendant was not deprived of his due process right to a fair trial, and (4) that the prosecutor's questions concerning the defendant's remorse were not improper. Therefore, we conclude that the prosecutor did not improperly place evidence concerning the defendant's postarrest silence before the jury.

B

We next turn to the defendant's contention that the prosecutor engaged in impropriety by arguing facts not in evidence during his closing argument and rebuttal. Specifically, the defendant claims that the prosecutor argued facts not in evidence during his closing argument by (1) speculating about what the defendant could have done to evade arrest instead of punching the victim in the head, (2) arguing that the defendant knew he had to do something serious to get away from the victim and that he could strike the victim to accomplish this, (3) arguing that the defendant stole the sneakers because he wanted the new, popular model that he took, and (4) distorting the facts by arguing to the jury that the victim's and the defendant's accounts of what happened as they walked back to Famous Footwear from Target contradicted each other. The state argues in response that the prosecutor did not argue facts not in evidence and instead urged the jury to draw reasonable inferences from the evidence presented at trial. We are not persuaded that the prosecutor's remarks were improper.

The following additional facts are relevant to our consideration of this aspect of the defendant's prosecutorial impropriety claim. During trial, the victim testified that, after he witnessed the defendant stealing the shoes, he followed him into Target, confronted him, and the defendant agreed to return to Famous Footwear with him. On the walk back, he told the defendant that

he would not call the police if the defendant returned the shoes, and that he could retrieve his old shoes. The victim also testified that the brand of Nike shoes that the defendant took were new and in demand. Rogers further testified that the shoes at Famous Footwear were generally more expensive than those at the Payless Shoes store. The defendant later testified, however, that he did not recall passing a Payless Shoes store when he was trying to find a place to purchase sneakers, and that he decided to go to Famous Footwear first because he figured, on the basis of the store's name, that it sold shoes. The defendant stated that, prior to the date of the incident, he had never heard of Famous Footwear.

The issue of the defendant's intent to cause serious physical injury to the victim arose later during cross-examination. On cross-examination, the defendant testified that, after he agreed to return to Famous Footwear with the victim, he kept pleading with the victim to let him return the shoes he stole and asked to have his old shoes back. Although the defendant and the victim proceeded back to Famous Footwear amicably at first, the victim then radioed Rogers, asking her to call the police, and the defendant reacted by punching the victim in the head. The defendant testified that he intended only to avoid capture when he punched the victim. As previously discussed, the defendant also admitted during cross-examination that he could have tried shoving the victim in the chest, punching him in the stomach, tripping him, or simply running away to avoid going to jail. The defendant testified, however, that the victim might have chased him if he attempted to flee because the victim appeared to be in good shape.

During closing argument, the prosecutor revisited this theme, and made the following comments to the jury: "And when you deliberate to reach your verdict on that and you consider that element, did he intend to cause serious physical injury, just go through all the question[s] I asked him. What he could have done, he could have pushed him, he could have shoved him, he could [have] just tried to run away with the sneakers, he could have punched him in his stomach. I didn't ask him, but I think it's common sense, he could have kicked him in the groin, right? So, there's a lot of things he could have done but, instead, he chose to close his right fist, his dominant hand, his strong hand, he chose to throw a punch, he chose to throw that punch at his skull . . . . He knew that walking away wasn't enough to get away with the sneakers, he knew that he had to do something to seriously take [the victim] out of the equation, and that's what he did." The prosecutor also argued that, "the state submits to you, the reasonable inference that you can draw from the facts and the evidence, is that he didn't want to shop at Payless, he didn't want the knockoff or off brands sold by Payless, he wanted to go to pay more, Famous Footwear, and that's where they went. He wanted the Nike SBs, the

new hot sneaker."

During his rebuttal argument, the prosecutor made additional arguments concerning the defendant's intent to cause serious physical injury and the defendant's credibility. First, the prosecutor followed up on the theme that the defendant knew he needed to use significant force to escape from the victim by stating that "[the defendant] knew he could strike [the victim], knock him unconscious and get out of there." Second, the prosecutor attempted to bring the defendant's credibility into question by comparing his version of the events with the victim's. Specifically, the prosecutor noted that "[the defendant] says he pleaded with [the victim], just give me my old sneakers back. And [the victim] says the opposite. [The victim] says, I said to him, just come back to the store, give me your sneakers, give me those sneakers, I'll give you your sneakers, I don't have to call the police. So, who do you believe there? The defendant who testified he—obviously, the outcome of this case is important to him. Or [the victim] who said, I remember saying, 'call the police,' and I woke up in Hartford Hospital. That was, really, the sum and substance of his testimony. Who do you believe there? Whose version of events do you believe?" The defendant did not object to any aspect of the prosecutor's closing or rebuttal arguments.

"Certainly, prosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however, counsel] must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Brett B.*, supra, 186 Conn. App. 573–74. In fulfilling his duties, however, a prosecutor "must confine himself to the evidence in the record. . . . [A] lawyer shall not . . . [a]ssert his personal knowledge of the facts in issue, except when testifying as a witness. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument. . . . Our case law reflects the expectation that jurors will not only weigh conflicting evidence and resolve issues of credibility as they resolve factual issues, but also that they will consider evidence on the basis of their common sense. Jurors are not expected to lay aside matters of common knowledge or their own observation and experience of the affairs of life, but, on the contrary, to apply them to the evidence or facts in hand, to the end that their action may be intelligent and their conclusions correct. . . . A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Marrero*,

We agree with the state that the prosecutor's comments invited the jury to draw reasonable inferences from the evidence presented at trial rather than arguing facts not in evidence. We note at the outset that defense counsel failed to object to any aspect of the prosecutor's closing argument. "A defendant's failure to object to an alleged impropriety strongly suggests that his counsel did not perceive the argument to be improper. If counsel did not believe that the argument was improper at the time, it is difficult for this court, on review, to reach a contrary conclusion." Id., 121–22. "We emphasize the responsibility of defense counsel, at the very least, to object to perceived prosecutorial improprieties as they occur at trial, and we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was unfair in light of the record of the case at the time." (Internal quotation marks omitted.) Id., 122. Accordingly, the failure of defense counsel to object to the prosecutor's closing arguments indicates that she did not perceive his arguments to be unfair.

Additionally, there was ample evidence presented at trial to support the prosecutor's arguments. In response to the prosecutor's questions, the defendant expressly admitted that he could have tried shoving the victim, tripping him, or punching him in the stomach in order to get away and evade arrest. He also testified that, although he could have tried running away rather than engaging in any physical contact with the victim, the victim might have chased him if he attempted to flee because the victim appeared to be in good shape. The prosecutor, in discussing the defendant's intent to cause serious physical injury to the victim during his closing argument, reiterated these themes. Rather than engaging in speculation unconnected to the evidence produced at trial, the prosecutor was instead inviting the jury to draw the reasonable inference that the defendant intended to cause serious physical injury to the victim because he chose to initiate the type of direct physical contact that was more likely to cause such injury. The prosecutor's comments were, therefore, proper.

Furthermore, the prosecutor's comments concerning the defendant's motivation for shopping at Famous Footwear were also derived from the evidence. Although the defendant testified that he had never heard of Famous Footwear, the prosecutor introduced evidence that the retail prices of shoes at Famous Footwear were generally higher than those at Payless Shoes and that the sneakers the defendant took, Nike SBs, were popular and in demand at the time of the incident. On the basis of this evidence, the prosecutor argued to the jury that the defendant wanted to shop at Famous Footwear because he wanted to pay more and that he

wanted the new popular sneaker. The prosecutor did not present these statements as established facts and, instead, noted that he was "submitting" them to the jury as a reasonable inference it could draw from the facts and the evidence. The "submitting" language, along with appropriate evidence produced at trial from which the jury could have reasonably inferred the prosecutor's submission, indicates that the prosecutor was not arguing facts not in evidence. See *Williams* v. *Commissioner of Correction*, 169 Conn. App. 776, 787, 153 A.3d 656 (2016) (prosecutor's use of restrictive "I submit" language indicated that he was raising inferences rather than expressing his own opinion or providing facts not in evidence). We thus conclude that such comments were not improper.

Finally, contrary to the defendant's contention, we conclude that the prosecutor did not engage in impropriety by arguing to the jury that the victim's and the defendant's accounts of what happened as they walked back to Famous Footwear from Target were contradictory. The victim testified that he told the defendant that he would not call the police if the defendant returned the sneakers that he had taken. In contrast, the defendant testified that he had been the one to raise the issue of returning the sneakers without police involvement. Thus, although both accounts were similar in content, they differ on the issue of who stated that no police involvement was necessary if the defendant returned the sneakers and took back his old ones. By noting that the accounts were opposites and asking the jurors to assess which version they believed, the prosecutor was merely asking the jury to make a credibility determination on the basis of the testimony of the victim and the defendant. We therefore conclude that these comments were not improper.

C

Finally, the defendant contends that the prosecutor engaged in impropriety by arguing to the jury that, in order to find the defendant not guilty, it would have to find that two eyewitnesses and the victim were lying, in violation of *State* v. *Singh*, 259 Conn. 693, 793 A.2d 226 (2002). We do not agree.

The following additional facts are relevant to this claim. During closing argument, defense counsel highlighted an inconsistency in the testimony of some of the state's witnesses. Specifically, Rogers and Dalessandro told the police after the incident that the defendant had punched the victim in the face, but Rogers later testified at trial that the defendant hit the victim in the head. On rebuttal, the prosecutor responded to defense counsel's argument by remarking, "[t]he first thing I'll say is, if the punch was to the face, why are there no injuries to the face? You heard the doctor testify there was a small hematoma in the area of where the fracture was, that's where the punch was. So, a seventeen year old

girl and Mr. Dalessandro tell the police what they saw, the police write it out and they sign it. And they say the punch was in the face, but now they come here and say it was in the head. Are they lying? Does that call their credibility into question in your minds? We'll talk about credibility in a minute, but that is a nonissue." When later discussing the witnesses' credibility, the prosecutor stated: "And when you assess credibility, remember [the defendant] took the [witness] stand; were Dalessandro and Anna Rogers, were they lying about what they saw? Yes, assess their credibility, but assess his as well." As previously observed, the prosecutor also commented on the defendant's and the victim's accounts of the incident, stating that their versions were opposites and asking the jurors whose version they believed.

"[C]ourts have long admonished prosecutors to avoid statements to the effect that if the defendant is innocent, the jury must conclude that witnesses have lied. . . . The reason for this restriction is that [t]his form of argument . . . involves a distortion of the government's burden of proof. . . . Statements of this type create the risk that the jury may conclude that, in order to acquit the defendant, it must find that the witness has lied." (Citation omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Ciullo*, 314 Conn. 28, 50, 100 A.3d 779 (2014). "[C]losing arguments providing, in essence, that in order to find the defendant not guilty, the jury must find that witnesses had lied, are . . . improper." *State* v. *Singh*, supra, 259 Conn. 712. "[W]hen [however] the prosecutor argues that the jury must conclude that one of two versions of directly conflicting testimony must be wrong, the state is leaving it to the jury to make that assessment. Moreover, by framing the argument in such a manner, the jury is free to conclude that the conflict exists due to mistake (misperception or misrecollection) or deliberate fabrication." *State* v. *Albano*, 312 Conn. 763, 787, 97 A.3d 478 (2014).

Here, the prosecutor's comments that the defendant challenges on appeal did not implicate a core justification for the *Singh* rule because they did not force the jury to find the defendant not guilty only if it first concluded that the other witnesses had lied. The defendant expressly stated during cross-examination that he punched the victim in the head. The jury was thus not required to find that Rogers and Dalessandro were lying about the location of the punch to find the defendant not guilty because, even if they were lying, the defendant himself admitted to punching the victim in the head. The jury thus could have found the defendant guilty on the basis of his testimony alone. Moreover, the prosecutor did not frame his statements in a manner that suggested to the jury that it would need to find that the state's witnesses had lied in order to find the defendant not guilty. The prosecutor instead framed his arguments

by asking the jury to weigh the credibility of each witness. Such arguments concerning witness credibility are entirely permissible. See *State* v. *Dawes*, 122 Conn. App. 303, 312, 999 A.2d 794 (prosecutor's comments were proper when based on evidence adduced at trial and reflect prosecutor's effort to invite jury to draw reasonable credibility inferences), cert. denied, 298 Conn. 912, 4 A.3d 834 (2010). Defense counsel also failed to object to any of these statements challenged on appeal. Such a failure indicates that she did not believe these comments to be improper in light of the record at that time. *State* v. *Marrero*, supra, 198 Conn. App. 122. In light of these considerations, we conclude that the prosecutor did not violate *Singh*.

The judgment is affirmed.

In this opinion ELGO, J., concurred.

[1] As a preliminary matter, we note that the defendant did not preserve some of his claims of prosecutorial impropriety by objecting to the alleged improprieties at trial. Specifically, the defendant failed to object to the alleged improprieties that the prosecutor made during his closing argument by arguing facts not in evidence and by arguing to the jury that in order to find the defendant not guilty, it would have to find that two eyewitnesses and the victim were lying, in violation of *State* v. *Singh*, 259 Conn. 693, 793 A.2d 226 (2002). Although the defendant did not preserve these claims, "[o]nce prosecutorial impropriety has been alleged . . . it is unnecessary for a defendant to seek to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989) [as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015)], and it is unnecessary for an appellate court to review the defendant's claim under *Golding*." (Internal quotation marks omitted.) *State* v. *Fasanelli*, 163 Conn. App. 170, 174, 133 A.3d 921 (2016). "The reason for this is that . . . appellate review of claims of prosecutorial [impropriety involves] a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out by [our Supreme Court] in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). . . . The consideration of the fairness of the entire trial through the *Williams* factors duplicates, and, thus makes superfluous, a separate application of the *Golding* test." (Citation omitted; internal quotation marks omitted.) *State* v. *Daniel W.*, 180 Conn. App. 76, 110, 182 A.3d 665, cert. denied, 328 Conn. 929, 182 A.3d 638 (2018).

[2] It is unclear from the record why the court sustained the objections to the prosecutor's additional questions about the defendant's remorse. Defense counsel did not state a reason for the objection, and the court did not explain why it sustained the objections, after having previously allowed the state to pursue this line of inquiry.

[3] Indeed, the defendant has not raised any claim on appeal that a *Doyle* violation actually occurred.

[4] It is clear that such evidence would have been permissible. Both the court and defense counsel stated that they did not believe such evidence would violate *Doyle* and was thus permissible.

[5] Even if we were to assume that the prosecutor's question constituted impropriety, we are not persuaded that the defendant was deprived of his due process right to a fair trial. Under our review of the *Williams* factors, we first note that the prosecutor's question was not invited by the defense. The first factor thus favors the defense.

We conclude, however, that the remaining factors favor the state. In regard to the severity and frequency factors, "the severity of the impropriety is often counterbalanced in part by the third *Williams* factor, namely, the frequency of the [impropriety] . . . ." (Internal quotation marks omitted.) *State* v. *Daniel W.*, supra, 180 Conn. App. 113. "Improper statements that are minor and isolated will generally not taint the overall fairness of an entire trial." (Internal quotation marks omitted.) Id. Here, the alleged impropriety concerning the defendant's postarrest silence was not pervasive throughout the trial but was confined to a single question during the course of twenty-one transcribed pages of direct examination of Detective Crean. Thus, the potential impropriety, a single question to which the court appears to have

sustained an objection, cannot be classified as "frequent" or "severe" given the lengthy direct examination and the absence of any evidence elicited. Moreover, the question was not central to the critical issue of whether the defendant intended to cause serious physical injury to the victim. The curative measures that the court took were also strong. Defense counsel immediately objected to the question, and no evidence was elicited. Although the court did not issue a specific curative instruction to the jury concerning this question, we conclude that any potential improper effect was diminished by the court's general instructions to the jury at the start of trial and before closing argument. In those instructions, the court emphasized that questions, objections, arguments, and statements made by the attorneys were not evidence. The strength of the curative measures factor thus weighs in favor of the state. See *State* v. *Ross*, 151 Conn. App. 687, 702–703, 95 A.3d 1208 (court's general instructions to jury that arguments made by counsel were not evidence diminished any improper effect of instances of claimed impropriety), cert. denied, 314 Conn. 926, 101 A.3d 271 (2014).

Finally, the last *Williams* factor, which assesses the overall strength of the state's case, also weighs in favor of the state. As previously observed, there was sufficient evidence from which the jury could have reasonably found that the defendant intended to cause serious physical injury to the victim. Specifically, the defendant acknowledged his belief that the victim would continue to follow him if he tried to continue walking. He then admitted to punching the victim with a closed fist using his dominant right hand and fleeing the scene. The force of his punch immediately knocked the victim unconscious and fractured his skull in multiple places. The state's case was thus strong. We therefore conclude that the prosecutor's question concerning Detective Crean's attempt to interview the defendant, even if improper, did not deprive the defendant of his due process right to a fair trial.

––––––––––––––––––––––––––